**Martin WILLIAMS, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: Oct. 14, 1987.
Record Supplemented: Dec. 22, 1987.
Decided: March 10, 1988.

Richard M. Baumeister, Asst. Public Defender, Wilmington, for appellant.

Loren C. Meyers (argued), Charles Butler, and Gary A. Myers, Deputy Attys. Gen., Wilmington, for appellee.

Before CHRISTIE, C.J., HORSEY, MOORE, WALSH and HOLLAND, JJ. (constituting the Court *en banc*).

HOLLAND, Justice:

The defendant-appellant, Martin W. Williams ("Williams"), was convicted, following a jury trial, of second degree burglary and misdemeanor theft. After the convictions and prior to sentencing, the State moved to declare Williams an habitual offender, pursuant to 11 *Del.C.* § 4214(b), on the basis of two prior convictions of second degree burglary. This motion was granted, and Williams was sentenced to life imprisonment without the possibility of probation or parole.

On appeal, Williams challenges the sufficiency of the evidence to support his convictions for second degree burglary and misdemeanor theft. Williams also appeals the Superior Court's determination to sentence him as an habitual offender pursuant to 11 *Del.C.* § 4214(b). We find that there was sufficient evidence to sustain the convictions and to support the classification of Williams as an habitual offender.

*Facts*

On the morning of December 30, 1985, Ira Vandergrift ("Vandergrift") was on the second floor of his West 17th Street home in Wilmington when he heard some noise emanating from the downstairs area.

Since his wife and sister had gone shopping, he called down to find out who was in the house with him. Vandergrift testified that someone, who sounded like a young black man, replied that he was "supposed to do some garden work." Vandergrift called down his address and heard the man reply that he was in the wrong house.

The man had left by the time Vandergrift made his way downstairs. Vandergrift discovered that a small drawer which he had previously closed was now open and that his wallet was missing from drawer. Vandergrift telephoned the police immediately to report what had happened. He subsequently told the police that his wallet contained approximately seven or eight one dollar bills. Vandergrift also reported to the police that approximately three dollars in loose change, kept in a glass dish, was missing.

The report of a burglary in progress at the Vandergrift home was radioed to all patrol cars by Wilmington police dispatchers. Several police patrol cars converged upon the area from different directions. One police car approached John E. Thornton ("Thornton"), an employee of the City of Wilmington, Division of Parks and Recreation, who was working in the area of Stapler Park near Vandergrift's home. Stapler Park is bounded by Bancroft Parkway, Union, 16th and 17th Streets. In response to an inquiry about observing any suspicious activity, Thornton gave the police a description of a black male, wearing a white jacket and dark pants, who he had seen jump a fence surrounding the park just two or three minutes earlier.

At trial, Thornton testified that at the time of the Vandergrift burglary he was working in Stapler Park when he and a friend observed a black male jump a fence and exit the park at a fast pace, continuously looking back as he walked away. Thornton testified that he remarked to his friend at the time: "That boy just stole something. He looks suspicious."[1] Thornton identified Williams at the trial as the person he saw jumping the fence.

Thornton's description of a black male wearing a white jacket and dark pants was immediately broadcast by police dispatchers. At trial, Detective Philip Saggione ("Saggione") testified that he was three or four blocks from the Vandergrift residence when he heard the report of a burglary in progress, followed by a description of the suspect over the police radio. Saggione testified that he saw a black male, wearing a white jacket with dark pants, at the corner of 16th Street walking southbound on Union Street in a fast manner. That person, who was apprehended and subsequently arrested, was identified at trial by Saggione as Williams. At the time of his arrest, Williams was searched. He was found to have nine one dollar bills and three dollars and ninety-three cents in loose coins in his pockets.

Williams testified that he had been in the vicinity of 16th and Union Streets for some time prior to his arrest. He stated that he had worked for an upholstery dealer, known as Everfast, in the neighborhood and that he had also worked for other private individuals in the Bancroft Parkway area. Williams related that he had been to a particular residence in the vicinity to seek employment; however, no one answered the door. He testified that he was returning from that residence by way of Stapler Park when he was apprehended by the police. Williams stated that he was taking a familiar route when he jumped over the fence. Williams denied entering Vandergrift's house or taking any items from the house.

*Sufficiency of the Evidence*

Williams argues that the evidence in this case manifestly fails to meet the standard of *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), and its Delaware progeny and is insufficient to support a verdict of guilty. Williams also contends that the evidence presented by the State, which was all circumstantial, is rationally consistent with any number of innocent explanations.

1. Some time after the police left, Thornton saw a person wearing the clothes he had described sitting in the back seat of a police vehicle on 17th Street.

The State argues that the evidence it offered sufficiently met the burden imposed by the *Jackson* standard. The State does admit that mere presence at the scene of the crime, without more, is insufficient to establish complicity.[2] The State contends, however, that Williams' proximity to the scene of the crime, as well as the other circumstantial evidence which it presented and the inferences drawn therefrom, support the jury's verdict that Williams committed the burglary and theft at Vandergrift's home.[3]

Williams' conviction rested exclusively upon circumstantial evidence. Prior to 1972, the law in Delaware provided that when a conviction rested entirely upon circumstantial evidence, the evidence had to be "consistent solely with the reasonable hypothesis of guilt." *Smith v. State*, Del. Supr., 229 A.2d 21, 21 (1967) (citing *Littlejohn v. State*, Del.Supr., 219 A.2d 155, 157 (1966)). Thus, prior to 1972, if the evidence was purely circumstantial and there was an alternative explanation of innocence that was consistent with the evidence, the conviction could not be sustained. *See Littlejohn v. State*, 219 A.2d at 157.

In 1972, this Court adopted a less restrictive standard, i.e., the federal standard, regarding the evaluation of circumstantial evidence. *See Henry v. State*, Del.Supr., 298 A.2d 327, 330 (1972). The United States Supreme Court stated the rationale for this less restrictive standard in *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

[T]he better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect[.]

Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weight the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

*Id.* at 139–40, 75 S.Ct. at 137–38 (citations omitted), *quoted in Henry v. State*, 298 A.2d at 330.

---

**2.** State's Answering Brief at 7, *Williams v. State*, Del.Supr., No. 411, 1986 (citing *Dalton v. State*, Del.Supr., 252 A.2d 104, 105 (1969)) (holding that mere presence at the crime scene, without more, is insufficient to prove accomplice liability)). *See also Tasco v. State*, 223 Md. 503, 165 A.2d 456, 459 (1960) ("[M]ere presence of a person at the scene of a crime is not, *of itself*, sufficient to establish that that person was either a principal or an accessory to the crime. But presence at the immediate and exact spot where a crime is in the process of being committed is a very important factor to be considered in determining guilt...." (citations omitted) (emphasis in original)).

**3.** The appellant was charged with and convicted of second degree burglary and misdemeanor theft. The applicable burglary statute provides as follows:

§ 825. Burglary in the second degree; class C felony.

A person is guilty of burglary in the second degree when he knowingly enters or remains unlawfully:

(1) In a dwelling with intent to commit a crime therein; or

(2) In a building and when, in effecting entry or while in the building or in immediate flight therefrom, he or another participant in the crime:

a. Is armed with explosives or a deadly weapon; or

b. Causes physical injury to any person who is not a participant in the crime.

Burglary in the second degree is a class C felony.

11 *Del.C.* § 825 (1987). The applicable theft statute provides, in pertinent part, as follows:

§ 841. Theft; class E felony; class A misdemeanor.

A person is guilty of theft when he takes, exercises control over or obtains property of another person intending to deprive him of it or appropriate it. ...

....

Theft is a class A misdemeanor, unless the value of the property received, retained or disposed of is $500 or more, in which case it is a class E felony.

11 *Del.C.* § 841 (1987).

Approximately seven years after this Court's decision in *Henry*, the United States Supreme Court held that when a defendant argues that the evidence is insufficient to support a guilty verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original), *quoted in Davis v. State*, Del.Supr., 453 A.2d 802, 803 (1982) (per curiam).[4] Therefore, we must review the evidence against Williams according to the standards enunciated in *Holland/Henry* and *Jackson/Davis*.

### Inferences from the Evidence in This Case

The State's circumstantial case against Williams was comprised of a series of facts and the inferences which flowed from those facts. The State first proved that whoever was burglarizing the Vandergrift home was surprised to learn that it was occupied when Vandergrift called downstairs. The inference that the State would draw from this fact is that the burglar would be startled and would quickly flee the residence and the area.

The State next proved that Williams was seen running from the general direction of the Vandergrift home by Thornton, a park worker, at about the same time that the burglary was reported. The testimony also showed that Williams was the only person in the area, and Williams was characterized as acting in a suspicious manner because he ran between several houses, jumped over a fence, and thereafter crossed Stapler Park at a brisk pace, looking back repeatedly. The inference that the State argued follows from this evidence is that Williams was fleeing from something, e.g., the Vandergrift home.

Williams was stopped by the police within minutes of the burglary only a few

blocks from Vandergrift's home. Williams was stopped because he was the only person in the area and because he matched the description of the person who was described as jumping the fence and acting suspiciously. Williams was subsequently identified by the park worker as the same person that he had seen jumping the fence.

When the police searched Williams, he had on his person nine one dollar bills and three dollars and ninety-three cents in change. Vandergrift reported that the items stolen from his home included seven or eight one dollar bills and approximately three dollars in change. The State argues that it is logical to infer that this money was taken from the Vandergrift home. The State argues that the logical extension of the inferences created by all of its evidence is that Williams burglarized the Vandergrift home.

Williams testified in his own defense. He argued that all of his conduct was consistent with the innocent explanations he presented. Williams' explanations and credibility were properly submitted to and evaluated by the jury. Unfortunately for Williams, they were resolved in the State's favor. "It has long been our law that the jury is the sole judge of the credibility of the witnesses and responsible for resolving conflicts in the testimony." *Tyre v. State*, Del.Supr., 412 A.2d 326, 330 (1980). *See also Sheeran v. State*, Del.Supr., 526 A.2d 886, 892 (1987).

■ Naturally, Williams disagrees with the jury's resolution of the conflict between his testimony and the inferences to be drawn from the testimony of the State's witnesses. However, we find the evidence sufficient to support a verdict of guilty. "[T]he evidence, viewed in its entirety and including all reasonable inferences, is sufficient to enable a jury to find that the State's charge[s] [have] been established beyond a reasonable doubt." *Holden v. State*, Del.Supr., 305 A.2d 320, 322 (1973),

---

**4.** In *Davis v. State*, Del.Supr., 453 A.2d 802, 803 (1982) (per curiam), this Court affirmed, *inter alia*, a conviction for the crime of conspiracy which was challenged on the grounds of insufficient evidence. In that case, this Court expressly applied the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

*quoted in Potts v. State,* Del.Supr., 458 A.2d 1165, 1167 (1983). *See also Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789; *Holland v. United States,* 348 U.S. at 139–40, 75 S.Ct. at 137–38; *Davis v. State,* 453 A.2d at 803; *Henry v. State,* 298 A.2d at 330.

### Habitual Offender Status

In 1986, in the underlying action, Williams was convicted of second degree burglary. Following Williams' adjudication of guilt, the State moved to declare Williams an habitual offender under 11 *Del.C.* § 4214(b) (1987).[5] The basis for the State's motion was Williams' prior convictions for second degree burglary as the result of residential daytime burglaries committed in 1978 and 1982. The Superior Court granted the State's motion and imposed a mandatory life sentence without the possibility of parole.

In 1978, Williams was charged with three separate counts of second degree burglary for the daytime entry into three separate residences. He was also charged with attempted burglary in the second degree as a result of an attempt to enter a fourth residence during the daytime. Williams pled guilty to two counts of second degree burglary and one count of third degree burglary. He was sentenced to three years of imprisonment on each count. When Williams' guilty plea was entered in 1978,

various related theft and conspiracy charges were dismissed by the State.[6]

In 1982, Williams was charged with another daytime residential burglary. Williams pled guilty, as charged, to second degree burglary. He received a four-year prison sentence, followed by one year of probation. Various charges, relating to the theft of a television, a video recorder, and jewelry from that residence, were again dismissed by the State when Williams entered his guilty plea. The disposition of the 1982 charges against Williams leads us to conclude that the burglary of the Vandergrift home in 1985 took place during a period of time when Williams was out of prison on probation or parole.

Williams contends on appeal that his sentence of life imprisonment without parole is disproportionate to the crimes committed, shocks the moral sense of the community, and is a constitutionally impermissible punishment. He argues that the crimes he was convicted of were nonviolent, i.e., committed against property and not the person of the victims. He further asserts that *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), is dispositive of this issue because of the factual similarity of the two cases. Under *Solem,* Williams urges this Court to find that 11 *Del.C.* § 4214(b), as applied to him, imposes an unconstitutionally disproportionate sentence in violation of the Eighth Amendment ban on "cruel and unusual punishments." *See* U.S. Const. amend. VIII.[7]

---

5. The Delaware recidivist statute provides in pertinent part:

   § 4214. Habitual criminal; life sentence.

   . . . .

   (b) Any person who has been 2 times convicted of a felony or an attempt to commit a felony hereinafter specifically named, under the laws of this State, and/or any other state, United States or any territory of the United States, and who shall thereafter be convicted of a subsequent felony hereinafter specifically named, or an attempt to commit such specific felony, is declared to be an habitual criminal, and the court in which such third or subsequent conviction is had, in imposing sentence, shall impose a life sentence upon the person so convicted unless the subsequent felony conviction requires or allows and results in the imposition of capital punishment. Such sentence shall not be subject to the probation or parole provisions of Chapter 43 of this title.

   . . . .

   11 *Del.C.* § 4214(b) (1987). Burglary in the second degree, the specific crime involved in the instant appeal, is one of the specifically named felonies under Section 4214(b).

6. Williams was originally indicted for three separate thefts relating to each burglary and involving the taking of clothing, jewelry, a stereo, camera equipment and a tape recorder from the various residences.

7. The Eighth Amendment to the United States Constitution provides:

   Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

   U.S. Const. amend. VIII. The Eighth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment. *E.g., Robinson v. California,* 370 U.S. 660, 666–

The State argues that Williams' sentence is rationally related to the permissible goals of punishment and is not disproportionate to the crimes committed. The State further contends that Williams' crimes were ones of violence. The State contends that there is no unfairness in the Delaware recidivist statute, 11 *Del.C.* § 4214(b), because it is applicable only to a narrow class of perpetrators who have multiple convictions of violent crimes.[8]

This is not a case of first impression. In recent years, the United States Supreme Court has decided a trilogy of cases of major importance which address state recidivist statutes and the relationship of the sentences imposed under those statutes to the Eighth Amendment ban on cruel and unusual punishments.

In the first of those cases, the Court, divided 5–4, upheld the imposition of a sentence of life imprisonment, pursuant to the Texas recidivist statute, finding that it did not constitute cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Rummel v. Estelle,* 445 U.S. 263, 285, 100 S.Ct. 1133, 1145, 63 L.Ed. 2d 382 (1980). In *Rummel,* the defendant had previously been convicted of and sentenced to serve time in prison for two nonviolent felonies. *Id.* at 265–66, 100 S.Ct. at 1134–35.[9] Upon being convicted for a third subsequent nonviolent felony, the defendant received a mandatory life sentence under the Texas recidivist statute. *Id.* at 266, 100 S.Ct. at 1135.

The *Rummel* Court attempted to restrict its proportionality review to those cases which involved the death penalty or especially brutal and barbaric punishments. *Id.* at 271–75, 100 S.Ct. at 1137–40. *See also The Supreme Court, 1982 Term,* 97 Harv. L.Rev. 1, 131 (1983). In upholding Rummel's sentence, the Court wrote, "the point at which a recidivist will be deemed to have demonstrated the necessary propensities and the amount of time that the recidivist will be isolated from society are matters largely within the discretion of the punishing jurisdiction." *Rummel v. Estelle,* 445 U.S. at 285, 100 S.Ct. at 1145. However, the *Rummel* majority was unable to completely preclude prison sentences from a proportionality review. Instead, the Court acknowledged that certain extreme prison sentences might be so disproportionate as to violate the Eighth Amendment's protections. *See id.* at 274 n. 11, 100 S.Ct. at 1139 n. 11. *See also The Supreme Court, 1982 Term, supra,* at 132.

The decision in *Rummel* was accompanied by a strong dissenting opinion by Justice Powell. In that dissent, Justice Powell argued that in enforcing "the constitutional limitations of the Cruel and Unusual Punishments Clause ... [the following] objective factors [should be relied upon:] (i) the nature of the offense; (ii) the sentence imposed for commission of the same crime in other jurisdictions; and (iii) the sentence imposed upon other criminals in the same jurisdiction." *Rummel v. Estelle,* 445 U.S. at 295, 100 S.Ct. at 1150 (Powell, J., dissenting) (citations omitted). Under this analytic framework, the dissent would have found the sentence imposed upon Rummel to be unconstitutionally disproportionate. *Id.* at 295–303, 100 S.Ct. at 1150–1154 (Powell, J., dissenting).

67, 82 S.Ct. 1417, 1420–21, 8 L.Ed.2d 758 (1962); *Spaziano v. Florida,* 468 U.S. 447, 468 n. 1, 104 S.Ct. 3154, 3166 n. 1, 82 L.Ed.2d 340 (1984) (Stevens, J., concurring in part and dissenting in part).

**8.** The gravamen of the State's argument comes from Justice Powell's dissenting opinion in *Rummel,* where he wrote: "A sentence may be excessive if it serves no acceptable social purpose, or is grossly disproportionate to the seriousness of the crime." *Rummel v. Estelle,* 445 U.S. 263, 293, 100 S.Ct. 1133, 1149, 63 L.Ed.2d 382 (1980) (Powell, J., dissenting). The State contends that the sentence serves an acceptable social purpose and that it is not disproportion-

ate. The State argues that the purpose is both to punish one who has demonstrated his propensity for crimes of the sort involved and to prevent the offender from having the opportunity to visit his wrath upon unwary members of society in the future.

**9.** In *Rummel,* the two predicate felonies were the fraudulent use of a credit card to obtain $80 worth of goods or services and passing a forged check in the amount of $28.36. The felony which triggered the implementation of the recidivist statute was a conviction for obtaining $120.75 by false pretenses. *Id.* at 265–66, 100 S.Ct. at 1134–35.

Following *Rummel*, the Court applied an Eighth Amendment analysis to a review of the constitutionality of a sentence of forty years imprisonment for possession of less than nine ounces of marijuana. *Hutto v. Davis*, 454 U.S. 370, 372–75, 102 S.Ct. 703, 704–06, 70 L.Ed.2d 556 (1982) (per curiam). In upholding the validity of Davis' sentence, the four remaining members of the *Rummel* majority were joined by Justice O'Connor. The Court reviewed its holding in *Rummel* as follows:

> [W]e distinguished between punishments —such as the death penalty—which by their very nature differ from all other forms of conventionally accepted punishment, and punishments which differ from others only in duration. This distinction was based upon two factors. First, this "Court's Eighth Amendment judgments should neither be nor appear to be merely the subjective views of individual justices." [*Rummel v. Estelle*, 445 U.S.] at 275, 100 S.Ct. at 1140. And second, the excessiveness of one prison term as compared to another is invariably a subjective determination, there being no clear way to make "any constitutional distinction between one term of years and a shorter or longer term of years." *Id.* Thus, we concluded that "one could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies, ... the length of the sentence actually imposed is purely a matter of legislative prerogative." *Id.* at 274, 100 S.Ct. at 1139. Accordingly, we held that Rummel's life sentence did not violate the constitutional ban on cruel and unusual punishment.
>
>     ....
>
> In short, *Rummel* stands for the proposition that federal courts should be "reluctan[t] to review legislatively mandated terms of imprisonment," *id.* at 274, 100 S.Ct. at 1139, and that "successful challenges to the proportionality of particular

sentences" should be "exceedingly rare," *id.* at 272, 100 S.Ct. at 1138.

*Hutto v. Davis*, 454 U.S. at 373–74, 102 S.Ct. at 704–06 (footnote omitted).

Although Justice Powell concurred with the *Hutto* majority opinion that *Rummel* controlled the case before the Court, he wrote a separate opinion in which, not surprisingly, he called for a reversal of *Rummel*. *Hutto v. Davis*, 454 U.S. at 375, 379–81, 102 S.Ct. at 706, 708–09 (Powell, J., concurring in the judgment). In *Hutto*, the Court did not attempt to determine whether a proportionality review would be appropriate in the case before it or to set forth criteria for determining when such review would be necessary for a prison sentence. *See Hutto v. Davis*, 454 U.S. at 374 n. 3, 102 S.Ct. at 705 n. 3; *The Supreme Court, 1982 Term, supra*, at 133 n. 44. Both Justice Powell's concurrence and Justice Brennan's dissent in *Hutto* noted the absence of such guidance and contended that the Court had begun viewing *Rummel* as standing for the proposition that a proportionality review would never be appropriate for prison sentences. *See Hutto v. Davis*, 454 U.S. at 377, 102 S.Ct. at 707 (Powell, J., concurring in the judgment); *id.* at 382–84, 102 S.Ct. at 709–11 (Brennan, J., dissenting).[10] Further guidance was soon to come.

Following the decision in *Hutto v. Davis*, the Court was faced with a third occasion to review the constitutionality of a sentence imposed pursuant to a state recidivist statute. In *Solem v. Helm*, the defendant had been convicted of six felonies prior to his conviction for "uttering a 'no account' check for $100," which served as the triggering felony for the South Dakota recidivist statute. 463 U.S. 277, 281, 103 S.Ct. 3001, 3005, 77 L.Ed.2d 637 (1983). Under South Dakota's statutory scheme, the sentence imposed was life imprisonment without probation or parole. *See id.* at 282, 103 S.Ct. at 3005.

---

**10.** *See also The Supreme Court, 1982 Term*, 97 Harv.L.Rev. 1, 127, 133 n. 44 (1983); Note, *Salvaging Proportionate Prison Sentencing: A Reply to Rummel v. Estelle*, 15 U.Mich.J.L. Ref. 285, 288 n. 23 (1982) (arguing that *Hutto*'s lack

of a proportionality analysis prevented predictions about how the United States Supreme Court would define the category of extreme sentences which would require a proportionality review).

With the addition of Justice Blackmun, the *Rummel* dissenters constituted the *Solem* majority. In another 5–4 opinion, the Court reviewed the proportionality of Helm's sentence, utilizing the objective factors set forth in the dissenting opinion in *Rummel*. *Solem v. Helm*, 463 U.S. at 290–92, 103 S.Ct. at 3009–11. The *Solem* majority held that a sentence of life imprisonment without the possibility of parole, imposed under South Dakota's recidivist statute on a defendant convicted of seven felonies, was disproportionate to the crimes committed by the defendant and violated the Eighth Amendment's ban on cruel and unusual punishment. *Id.* at 303, 103 S.Ct. at 3016. Justice Powell, writing for the majority, stated the principle as follows:

> [A] criminal sentence must be proportionate to the crime for which the defendant has been convicted. Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals. But no penalty is *per se* constitutional.

*Id.* at 290, 103 S.Ct. at 3009 (footnote omitted). However, *Solem* declined to adopt or approve "a general rule of appellate review of sentences." *Id.* at 290 n. 16, 103 S.Ct. at 3009 n. 16. The Court stated that "[i]n view of the substantial deference ... accorded legislatures ... a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate." *Id.*

The State argues that *Rummel*, not *Solem*, controls the case before us. We are not persuaded by that argument. Although *Solem* did not go so far as to overrule *Rummel*, it did repudiate much of the reasoning upon which *Rummel* relied.[11] Moreover, under the Texas statutory scheme, the defendant was not expressly precluded from the opportunity to seek parole. *See Solem v. Helm*, 463 U.S. at 301–02, 103 S.Ct. at 3015–16. In analyzing the defendant's sentence, the *Rummel* Court wrote, "a proper assessment of Texas' treatment of Rummel could hardly ignore the possibility that he will not actually be imprisoned for the rest of his life." 445 U.S. at 280–81, 100 S.Ct. at 1142–43. The Court in *Solem* found that a commutation system is fundamentally different from a parole system. 463 U.S. at 300–01, 103 S.Ct. at 3014–16.

> The possibility of commutation is nothing more than a hope for "an *ad hoc* exercise of clemency." It is little different from the possibility of executive clemency that exists in every case in which a defendant challenges his sentence under the Eighth Amendment. Recognition of such a bare possibility would make judicial review under the Eighth Amendment meaningless.

*Id.* at 303, 103 S.Ct. at 3016. "If nothing else, the possibility of parole, however slim, serves to distinguish Rummel from a person sentenced under a recidivist statute like [Delaware's], which provides for a sentence of life *without parole* upon conviction of three felonies...." *Rummel v.*

---

**11.** In response to the *Solem* dissenters' contention that this new approach effectively overruled *Rummel*, the majority noted:

> Contrary to the suggestion in the dissent, [463 U.S.] at 305–12, 103 S.Ct. at 3017–21, our conclusion today is not inconsistent with *Rummel v. Estelle*. The *Rummel* Court recognized—as does the dissent, *see* [463 U.S.] at 311 n. 3, 103 S.Ct. at 3020 n. 3—that some sentences of imprisonment are so disproportionate that they violate the Eighth Amendment. 445 U.S. at 274 n. 11, 100 S.Ct. at 1139 n. 11. Indeed, *Hutto v. Davis*, 454 U.S. [370,] 374 & n. 3, 102 S.Ct. 703, 705 & n. 3, 70 L.Ed.2d 556 [(1982)], makes clear that *Rummel* should not be read to foreclose propor-

tionality review of sentences of imprisonment. *Rummel* did reject a proportionality challenge to a particular sentence. But since the *Rummel* Court—like the dissent today—offered no standards for determining when an Eighth Amendment violation has occurred, it is controlling only in a similar factual situation. Here the facts are clearly distinguishable. Whereas Rummel was eligible for a reasonably early parole, Helm, at age 36, was sentenced to life with no possibility of parole. *See* [463 U.S.] at 297, 300–03, 103 S.Ct. at 3013, 3014–17.

*Solem v. Helm*, 463 U.S. 277, 303 n. 32, 103 S.Ct. 3001, 3017 n. 32, 77 L.Ed.2d 637 (1983).

*Estelle,* 445 U.S. at 281, 100 S.Ct. at 1143 (emphasis added).[12]

Various federal courts have examined the *Rummel* and *Solem* decisions and held that, although the *Solem* proportionality approach is controlling, "apart from *Solem's* particular factual context—a life sentence without the possibility of parole—an abbreviated proportionality review following the *Solem* guidelines satisfies eighth amendment demands." *United States v. Rosenberg,* 806 F.2d 1169, 1175 (3d Cir. 1986), *cert. denied,* — U.S. —, 107 S.Ct. 2465, 95 L.Ed.2d 873 (1987).[13] Under the Delaware recidivist statute, 11 *Del.C.* § 4214(b), Williams' sentence of life imprisonment without the possibility of parole is identical to the sentence that Helm received. Therefore, our inquiry must not only go beyond *Rummel,* but the case *sub judice* is one of those cases requiring an extended *Solem* proportionality analysis. *See United States v. Rosenberg,* 806 F.2d at 1175.

### Proportionality Analysis

The *Solem* Court established a three-part framework of analysis for Eighth Amendment claims that a sentence is disproportionate to the offense committed. The Court envisioned that this type of review would be "guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." *Solem v. Helm,* 463 U.S. at 292, 103 S.Ct. at 3011.

*Gravity of the offense.* This inquiry is directed to the "harm caused or threatened to the victim or society." *Id.* at 292, 103 S.Ct. at 3011. Williams argues that a residential burglary is a nonviolent crime. He finds support for that argument in references by the *Solem* majority, which characterized Helm's prior burglary convictions in that fashion. *See id.* at 296–97, 103 S.Ct. at 3012–13.

However, the references to Helm's prior convictions for burglary in those terms were undoubtedly influenced by the record before the Court. In *Solem,* it was "suggested at oral argument, the [South Dakota] third-degree burglary statute covered entering a building with the intent to steal a loaf of bread. It appears that the grand larceny statute would have covered the theft of a chicken." *Id.* at 297 n. 23, 103 S.Ct. at 3013 n. 23 (citation omitted).[14]

Nevertheless, independent of its reference to Helm's prior convictions, the *Solem* Court made it clear that the offense which triggers a life sentence without parole should be the paramount concern of reviewing courts. "We must focus on the

---

**12.** The parties in this case stipulated as follows:

1. The records of the Board of Pardons of the State of Delaware show that from 1970 to present, the Board has received 36 applications for commutation from individuals serving a term of life imprisonment without parole. The 36 applications were received from 20 inmates, several inmates having made more than one application. No applications have been made by inmates sentenced to life imprisonment without parole as an habitual offender.

2. Of the 36 applications, the Board of Pardons recommended commutation in 12 case[s].

3. The Governor of the State of Delaware granted commutation in 4 instances, in each case commuting the sentence as recommended by the Board.

Stipulated Expansion of Record at 1–2, *Williams v. State,* Del.Supr., No. 411, 1986. Under the Delaware Constitution, the Governor may commute sentences and grant pardons upon receiving the written recommendation of a majority of the Board of Pardons after a full hearing. Del. Const. art. VII, § 1.

**13.** *See also United States v. Rhodes,* 779 F.2d 1019, 1028 (4th Cir.1985), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986); *Moreno v. Estelle,* 717 F.2d 171, 180 n. 10 (5th Cir.1983), *cert. denied,* 466 U.S. 975, 104 S.Ct. 2353, 80 L.Ed.2d 826 (1984).

**14.** The *Solem* Court also observed that Helm was not a professional criminal but an alcoholic who had difficulty holding a job. 463 U.S. at 297 n. 22, 103 S.Ct. at 3013 n. 22. As we noted earlier, Williams was on probation or parole when the Vandergrift burglary occurred. Williams has been convicted of five separate residential daytime burglaries. However, since he entered a guilty plea to three of them on the same day in 1978, these three are considered one conviction for purposes of the Delaware recidivist statute. *See Hall v. State,* Del.Supr., 473 A.2d 352, 356–57 (1984).

principal felony—the felony that triggers the life sentence...." *Id.* at 296 n. 21, 103 S.Ct. at 3013 n. 21. The *Solem* majority was obviously concerned with the fact that the offense which triggered Helm's life sentence was a minor nonviolent crime—issuing a worthless check for a small amount of money. *See id.* at 296 & n. 20, 103 S.Ct. at 3013 & n. 20.

We conclude that a synthesis of the teachings of *Solem* directs reviewing courts to focus specifically upon the gravity of the triggering offense, taking into consideration its potential for harm, as well as the harm or potential for harm in the preceding offenses. In Williams' case, the triggering offense and the predicate offenses were all the same, i.e., daytime residential burglaries. Our focus, therefore, is upon a daytime burglary of a dwelling house or residence.

The views expressed by the majority and the minority opinions in *Solem* demonstrate that learned minds can differ with respect to the classification of burglaries as violent or nonviolent crimes. Chief Justice Burger, on behalf of the *Solem* dissenters, stated that burglary "cannot fairly be characterized as 'nonviolent.'" 463 U.S. at 315, 103 S.Ct. at 3023 (Burger, C.J., dissenting). This debate was continued in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), an opinion written by Justice White and joined in by the entire *Solem* majority. Although the *Garner* majority could not agree that burglary was so dangerous as to automatically justify the use of deadly force, it did agree "that *burglary is a serious crime.*" *Id.* at 21, 105 S.Ct. at 1706 (emphasis added).

To the extent that *Solem* directs us to focus upon the potential for violence or harm in the "triggering offense," the evidence regarding burglary has been graphically summarized by Justice O'Connor:

> Household burglaries not only represent the illegal entry into a person's home, but also "pos[e] real risk of serious harm to others." According to recent Department of Justice statistics, "[t]hree-fifths of all rapes in the home, three-fifths of all home robberies, and about a third of home aggravated and simple assaults are committed by burglars." During the period 1973–1982, 2.8 million such violent crimes were committed in the course of burglaries. Victims of a forcible intrusion into their home by a nighttime [or daytime] prowler will find little consolation in the majority's confident assertion that "burglaries only rarely involve physical violence." Moreover, even if a particular burglary, when viewed in retrospect, does not involve physical harm to others, the "harsh potentialities for violence" inherent in the forced entry into a home preclude characterization of the crime as "innocuous, inconsequential, minor, or 'nonviolent.'"

*Tennessee v. Garner*, 471 U.S. at 26–27, 105 S.Ct. at 1709–1710 (O'Connor, J., dissenting; Burger, C.J., and Rehnquist, J., joining) (citations omitted). *See also Restatement of Torts* § 131 comment g (1934); R. Perkins & R. Boyce, *Criminal Law* 1110 (3d ed. 1982); 4 W. Blackstone, *Commentaries on the Laws of England* *223 (1765); 3 C. Torcia, *Wharton's Criminal Law* § 335, at 206 (14th ed. 1980).[15]

■ In Delaware, a daytime housebreaking is considered a serious crime. The Delaware statute treats breaking into a dwelling, during the daytime, unaccompanied by actual violence, as seriously as breaking into another type of structure with a deadly weapon or when violence to a person results.[16] The object of punishing

---

**15.** According to the ancient common law of England, breaking into a mansion or dwelling house *by night* was deemed to be a capital offense. J. Michael & H. Wechsler, *Criminal Law and Its Administration* 368 (1940). In 1861, England abolished capital punishment for burglary in all cases. The Larceny Act, 1861, 24 & 25 Vict., ch. 96, § 52.

**16.** *See* 11 *Del.C.* § 825 (1987); for the text of the Delaware second degree burglary statute, *see supra* note 3. *See also Delaware Criminal Code with Commentary* § 824 commentary at 250 (1973) ("[T]he real danger to be protected against is any unlawful presence in a dwelling.... Mere presence, without any question of criminal intention, is a source of terror and potential crime.").

such breaking and entering is not only to prevent trespasses, but also to prevent residential trespasses which are often the first step to wrongs of greater magnitude like robbery or murder. *Cf.* O.W. Holmes, *The Common Law* 74 (1881).

Delaware is not alone in viewing a daytime burglary of a dwelling, by itself, as serious as a burglary of any building with a deadly weapon or involving actual violence. The statutes in Hawaii, Ohio, Oregon, and Texas treat breaking into a dwelling during the daytime in exactly the same manner as does the Delaware statute.[17] Even when the burglar is unarmed and no actual physical injury occurs, residential burglary is viewed as a crime of violence by several states. *See, e.g.,* Md.Ann.Code art. 27, § 643B(a) (1987) (daytime residential burglary is a crime of violence); 18 Pa.Cons.Stat.Ann. § 6102 (Purdon 1983) (burglary is a crime of violence); S.D.Codified Laws Ann. § 22–1–2(8) (1987 Cum. Supp.) (burglary is a crime of violence).[18]

The comment to the bill that became the Ohio statute, which would apply to the facts of the case before us, explains the concept in this manner:

> Since aggravated burglary carries the highest degree of risk that someone may be harmed, it is the most serious of the three breaking and entering offenses in the new code. Because the risk of personal harm is emphasized in such offenses, the traditional night-day distinction is done away with, and the type of structure involved is important only insofar as it is occupied or unoccupied....

Ohio Rev.Code Ann. § 2911.11 committee comment (Anderson 1987).

Blackstone stated long ago: "Burglary [of a dwelling] has always been looked upon as a very heinous offense, not only because of the abundant terror that it naturally carries with it, but also as it is a forcible invasion and disturbance of that right of habitation which every individual might acquire even in a state of nature...." 4 W. Blackstone, *supra,* at *223. More recently, Maryland's highest court has stated that "the risk of personal harm and the right to be free of intrusion are the concerns underlying the inclusion of daytime housebreaking as a crime of violence in Maryland's § 643B." *State v. Davis,* 310 Md. 611, 530 A.2d 1223, 1235 (1987).

A residence was and remains each person's castle, the final refuge from which

---

**17.** The relevant statutes in the other states are: Haw.Rev.Stat. § 708–810 (1985); Ohio Rev.Code Ann. § 2911.11 (Anderson 1987); Or.Rev.Stat. § 164.225 (1987); Tex.Penal Code Ann. § 30.02 (Vernon 1974).

The rational for this treatment in Texas is explained as follows:

> A separate burglary offense ... perform[s] an important criminological function in addition to its trespassory and attempt functions; it protects against intrusion in places where people, because of the special nature of the place, expect to be free from intrusion. The provision of this protection is the rationale underlying Section 30.02.

Tex.Penal Code Ann. § 30.02 practice commentary (Vernon 1974).

**18.** Burglary in the second degree has been characterized by this Court as violent. *Hall v. State,* Del.Supr., 473 A.2d 352, 354 n. 3 (1984). Delaware is not alone in viewing the crime involved here as violent and deserving of a harsh sentence. For example, in Texas a first offender housebreaker may be sentenced to life imprisonment. Tex. Penal Code Ann. §§ 12.32, 30.02 (Vernon 1974 & 1988 Cum.Supp.). Several other states allow for imprisonment of 30, 25, 20, or 15 years for the first offense of a similar crime. *See, e.g.,* D.C. Code Ann. § 22–1801(a) (1981) (30 yrs.); Ohio Rev.Code Ann. §§ 2911.-11, 2929.11(B)(1)(a) (Anderson 1987) (25 yrs.); Ala.Code §§ 13A–5–6(a)(2), 13A–7–6 (1982) (20 yrs.); Ark.Code Ann. §§ 5–4–401(a)(3), 5–39–201 (1987) (20 yrs.); Ga.Code Ann. § 16–7–1(a) (1984) (20 yrs.); Kan.Stat.Ann. §§ 21–3716, 21–4501(c) (1981 & 1987 Cum.Supp.) (20 yrs.); Minn.Stat.Ann. § 609.582 (West 1987) (20 yrs.); Mont.Code Ann. § 45–6–204 (1987) (20 yrs.); Neb.Rev.Stat. §§ 28–105(1), 28–507 (1985) (20 yrs.); Or.Rev.Stat. §§ 161.605(1), 164.225 (1987) (20 yrs.); 18 Pa.Cons.Stat.Ann. §§ 1103, 3502 (Purdon 1983) (20 yrs.); Va.Code Ann. § 18.2–91 (1982) (20 yrs.); Fla.Stat.Ann. §§ 775.082(3)(c), 810.02 (West 1976 & 1987 Cum.Supp.) (15 yrs.); Ill.Ann.Stat. ch. 38, paras. 19–3, 1005–8–1(a)(4) (Smith–Hurd 1982 & 1987 Cum.Supp.) (15 yrs.); Mich.Comp.Laws Ann. § 750.110 (West 1987 Cum.Supp.) (15 yrs.); Miss.Code Ann. § 97–17–21 (1973) (15 yrs.); S.D.Codified Laws Ann. §§ 22–6–1, 22–32–3 (1979 & 1987 Cum.Supp.) (15 yrs.); Utah Code Ann. §§ 76–3–203, 76–6–202 (1978 & 1987 Cum. Supp.) (15 yrs.); W.Va.Code § 61–3–11(a) (1984) (15 yrs.).

one need not flee, even if the alternative is to use deadly force. It is a place of security for one's family as well as for one's most cherished possessions. *Model Penal Code* § 221.1 comment 2 (1980). *See also Semayne's Case,* 5 Coke's Rep. 91a, 91b (1603); 11 *Del.C.* § 464(e)(2)(a) (1987). The unauthorized entry into a residence for the purpose of committing a crime is a grave matter.[19] We conclude that the Delaware legislature has historical support and support in other states at the present time for characterizing a daytime residential burglary as a serious crime involving potential danger to human life.

■ *Harshness of the Penalty.* We conclude our analysis under the first prong of *Solem* by acknowledging that Williams' sentence to imprisonment for life without parole is the most severe sentence, except for capital punishment, imposed in Delaware or in any other state. However, as our subsequent intra-jurisdictional and inter-jurisdictional analysis demonstrates, that sentence is not constitutionally disproportionate given Williams' separate, previous convictions for similar conduct.

*Intra–Jurisdictional Criminal Sentence Imposition.* The focus of this inquiry is upon whether, in Delaware, more serious crimes are subject to the same or a less severe sentence. *See Solem v. Helm,* 463 U.S. at 291, 103 S.Ct. at 301. Felonies, as defined by the Delaware Criminal Code, are classified for sentencing purposes into five categories—class A to class E. 11 *Del.C.* § 4201(a) (1987). The term of imprisonment which the court may impose for a felony is fixed by statute:

(1) For a class A felony, life imprisonment, except for conviction of first-degree murder in which event § 4209 of this title shall apply; provided, however, that in the case of an attempt to commit any class A felony, the court shall impose a term of imprisonment and may impose life imprisonment, but may impose less than life imprisonment, except for conviction of an attempt to commit first-degree murder, in which event the court shall impose life imprisonment;

(2) For a class B felony, from 3 to 30 years and such fine or other conditions as the court may order;

(3) For a class C felony, from 2 to 20 years and such fine or other conditions as the court may order;

(4) For a class D felony, 10 years and such fine or other conditions as the court may order;

(5) For a class E felony, 7 years and such fine or other conditions as the court may order.

11 *Del.C.* § 4205(b) (1987). The life sentence for all class A felonies, except first degree murder, includes a possibility of parole. First degree murder is treated as a unique class A felony in Delaware and is punishable by death or imprisonment for life without the benefit of probation, parole, or any other reduction. 11 *Del.C.* § 4209(a) (1987).

Williams was convicted of burglary in the second degree. This is a class C felony. 11 *Del.C.* § 825 (1987). The maximum penalty which can be imposed following conviction for a class C felony is normally twenty years of imprisonment. Williams, as an habitual offender, was sentenced to be imprisoned for life without probation or

---

**19.** One observer of French law has written the following about the French Code provisions governing the equivalent of burglary:

It is the protection which is due to places which are lived in or which serve for a place to live that the law endeavors to guarantee. But the "violation of the domicil," whatever its purpose may be, is not only an offence against property; it carries a threat to tranquillity, to the security of man in the place in which he lives. That is why all penal legislation has been obliged to determine, on the one hand a certain number of offenses with respect to which the circumstance of a place

which is lived in or which serves for a place to live constitutes an element of aggravation, and, on the other hand, to set up, as a special offense, the act of introducing one's self into a private home against the will of the person who lives in it. The inviolability of the person has thus for a consequence the inviolability of his abode. It is, in fact, as a result and an extension of the security of persons, of their homes, that the inviolability of the domicil must be considered. 4 Garraud, *Droit Penal Francais* 415–16 (3d ed. 1922), *reprinted in* J. Michael & H. Wechsler, *supra* note 15, at 382 n. 1.

parole. First degree murder is the only crime in Delaware which provides a similar penalty for a *single* offense. Accordingly, there are many class A and class B felonies in Delaware that are more serious than second degree burglary and for which the sentence is less severe than the one that Williams received.[20]

■ However, *Solem* states that "we recognize, of course, that Helm's prior convictions are relevant to the sentencing decision." *Solem v. Helm*, 463 U.S. at 296 n. 21, 103 S.Ct. at 3012 n. 21. Therefore, under this prong of the analysis, we must also factor in the recidivist status of the offender. Williams' sentence is placed into perspective when the Delaware recidivist statute is examined. Unlike the habitual offender statute in *Solem*, the portion of the Delaware recidivist statute under which Williams was sentenced does not "authorize[ ] life imprisonment after three prior convictions, regardless of the crimes." *Id.* at 298, 103 S.Ct. at 3014. Rather, under the relevant subsection of the Delaware recidivist statute, only specifically enumerated offenses will give rise to the habitual offender sentencing provisions. 11 *Del.C.* § 4214(b).[21] Williams' sentence of imprisonment for life without parole, the most severe noncapital punishment in Delaware, can only be invoked when the triggering offense is a third *separate* crime involving death or danger to human life. *See id.*

Reference to the legislative history of Section 4214 is helpful in this case. In 1953, Delaware enacted its first habitual criminal statute. *See* 49 *Del.Laws*, ch. 413, § 1 (codified at 11 *Del.C.* § 3911 (West 1954 Cum.Supp.) (amended 1970)). *See also Oney v. State*, Del.Supr., 446 A.2d 389, 391 n. 3 (1982). The statute did not create different categories for habitual criminal status. It only applied to persons convicted of four felonies and did not distinguish between the seriousness of either the prior or the most recent felony conviction. 49 *Del.Laws*, ch. 413, § 1. Hence, habitual criminal status in Delaware originally hinged solely upon the commission of any four felonies, without distinction as to the nature of either the three prior or the fourth triggering felony. *See Oney v. State*, 446 A.2d at 391.

The Delaware habitual criminal statute, 11 *Del.C.* § 3911, remained unchanged until 1970 when Section 3911 was rewritten by 57 *Del.Laws*, ch. 585, § 1. Old Section 3911 was redesignated subsection (a) of new Section 3911, but restated to provide as follows:

> (a) Any person who has been 3 times convicted of a felony, *other than those which are specifically mentioned in subsection (b) of this section*, under the laws of this State, and/or any other State, the United States or any territory of the United States, and who shall

---

**20.** Among the class A felonies are: 11 *Del.C.* §§ 635 (second degree murder), 636 (first degree murder), 774 (second degree unlawful sexual intercourse), 775 (first degree unlawful sexual intercourse), 783A (first degree kidnapping), 1339 (adulteration) (1987).

   Class B felonies include: 11 *Del.C.* §§ 613 (first degree assault), 632 (manslaughter), 783 (second degree kidnapping), 803 (first degree arson), 826 (first degree burglary), 1108 (sexual exploitation of a child), 1253 (escape after conviction), 1353 (promoting prostitution in the first degree), 1447 (possession of a deadly weapon during commission of a felony) (1987).

**21.** The crimes subject to 11 *Del.C.* § 4214(b) are: 11 *Del.C.* §§ 613 (first degree assault), 632 (manslaughter), 635 (second degree murder), 636 (first degree murder), 774 (second degree unlawful sexual intercourse), 775 (first degree unlawful sexual intercourse), 783 (second degree kidnapping), 783A (first degree kidnapping), 803

(first degree arson), 825 (second degree burglary), 826 (first degree burglary), 832 (first degree robbery) (1987); and 16 *Del.C.* §§ 4751, 4752, 4752A, 4753A (all dealing with narcotics and controlled substances) (1987).

   The list contained in Section 4214(b) includes: 11 *Del.C.* §§ 763 (second degree rape), 764 (first degree rape), 766 (first degree sodomy). However, these latter sections were deleted by the Delaware legislature in 1986. 65 *Del.Laws*, ch. 494, § 1. Therefore, we have listed here the relevant code provisions that have replaced the deleted sections which are still set forth in the provisions of Section 4214(b). *See* 11 *Del.C.* § 4214 revisor's note (1987) ("The revision of the provisions applicable to sexual offenses ... has rendered inaccurate the references to §§ 763, 764 and 766 in the second paragraph of subsection (b) and the reference to '§ 763' in subsection (d)."). This problem should be addressed by the legislature.

thereafter be convicted of a subsequent felony of this State is declared to be an habitual criminal, and the Court in which such fourth or subsequent conviction is had, in imposing sentence, may, in its discretion, impose a life sentence upon the person so convicted.

11 *Del.C.* § 3911(a) (West 1970 Cum.Supp.) (repealed and reenacted as 11 *Del.C.* § 4213(a) in 1973) (emphasis added).[22] The italicized words represented new language not found in old Section 3911. New subsection (b) provided in part:

> (b) Any person who has been 2 times convicted of a felony hereinafter specifically named, ... and who shall thereafter be convicted of a subsequent felony, hereinafter specifically named, of this State is declared to be an habitual criminal, and the Court ... shall impose a life sentence upon the person so convicted....

11 *Del.C.* § 3911(b) (West 1970 Cum.Supp.) (repealed and reenacted as 11 *Del.C.* § 4213(b) in 1973).[23] New subsection (b) represented new law giving habitual criminal status to a person who was convicted three times of specifically named felonies. As enacted in 1970, subsections (a) and (b) have remained essentially unchanged to date. *Oney v. State*, 446 A.2d at 392.

Although no legislative comments or notes accompanied the 1970 enactment of the habitual offender statute, the Commentary on then Section 4213 [24] which accompanied the 1972 revision of the Delaware Criminal Code is instructive. *Id.* That Commentary states:

> This section [Section 4213] establishes a procedure for imposing a life sentence on a person who has previously been convicted three times of a felony, except in the case of certain specified felonies

involving death, danger to human life where only two prior convictions are needed. In the latter case, probation and parole are specifically made unavailable. *Delaware Criminal Code with Commentary* § 4213 commentary at 493 (1973), *quoted in Oney v. State*, 446 A.2d at 392–93.

Williams' predicate offenses, as well as the triggering offense, were all second degree burglaries involving daytime residential entries. In choosing to expressly list the offenses under the purview of 11 *Del.C.* § 4214(b), the legislature determined that the common element of violence or potential threat to human life, associated with each of these crimes, justified separate classification for the purpose of punishment. In reviewing the conviction of another habitual burglar, this Court delineated the policy behind the Delaware recidivist statute:

> The reasoning which might justify life imprisonment for offenders who are being sentenced for a third felony (in this case a third housebreaking with intent to steal) is that the offender has committed still a third offense after having had two prior convictions followed by two separate chances to reform. In effect, the offender is being taken off the street because he is deemed to be incorrigible.

*Hall v. State*, Del.Supr., 473 A.2d 352, 356 (1984).[25] *See also* Annotation, *Chronological or Procedural Sequence of Former Convictions as Affecting Enhancement of Penalty for Subsequent Offense under Habitual Criminal Statutes*, 24 A.L.R.2d 1247, 1248–49 (1952).

Thus, while there may be "more serious offenses" which would bring a less severe sentence upon a first offense, this fact alone does not in any way lessen the legis-

---

22. In 1972, the Delaware legislature passed a bill, which became effective on April 1, 1973, repealing Section 3911 and reenacting it as Section 4213. 58 *Del.Laws*, ch. 497, § 2. Section 4213 was then subsequently codified at Section 4214 of the 1974 Revised Code of Delaware. *Compare* 58 *Del.Laws*, ch. 250, § 1 (creating 11 *Del.C.* § 615) *and* 58 *Del.Laws*, ch. 497, § 3 (renumbering 11 *Del.C.* § 615 to 11 *Del.C.* § 4213, thus unintentionally creating two sections numbered 4213 of the same title). *See*

*also Oney v. State*, Del.Supr., 446 A.2d 389, 392 n. 4 (1982).

23. *See supra* notes 5 & 22.

24. *See supra* note 22.

25. In *Hall*, the defendant allegedly "entered a dwelling and stole a bed sheet, two pillow cases, and a large quantity of coins." 473 A.2d at 352.

lature's justification in providing for a sentence of life imprisonment without parole to a person that is convicted on three separate occasions of certain specified felonies involving death or danger to human life.

Williams has exhibited his habitually criminal disposition and in imposing this sentence upon him, the State is clearly within its right to punish a recidivist more severely than a first offender. *Solem v. Helm,* 463 U.S. at 296, 103 S.Ct. at 3012. From the proportionality standpoint in Delaware, Williams and all persons convicted of three of the offenses enumerated in 11 *Del.C.* § 4214(b) are equally subject to a sentence of life imprisonment without parole. *Cf. State v. Davis,* 530 A.2d at 1235–36.

*Extra–Jurisdictional Criminal Sentence Imposition.* The final prong of the proportionality analysis requires comparison of "sentences imposed for commission of the same crime in other jurisdictions." *Solem v. Helm,* 463 U.S. at 299, 103 S.Ct. at 3014. We, therefore, look at the sentencing treatment in other states of daytime residential burglaries.

Under similar circumstances, Williams could have been sentenced to life imprisonment, albeit with the possibility of parole, for his *first* daytime housebreaking conviction in Texas; [26] for his second conviction in Alabama and Texas; [27] and for his third conviction in Alabama, the District of Columbia, Idaho, New York, South Carolina, Texas, and Utah.[28] In West Virginia, a life sentence upon conviction of a third household burglary is mandated, but parole is possible.[29] For a fourth burglary conviction, a number of states either require or authorize a life term of imprisonment.[30] We point out that for his fourth daytime housebreaking, Williams could have been sentenced to life imprisonment *without parole* in Louisiana, Maryland, Nevada, and South Dakota.[31]

Only in Delaware could a mandatory life term of imprisonment without the possibility of parole be imposed for a third daytime residential burglary. We recognize, however, that "[a]bsent a constitutionally imposed uniformity inimical to traditional notions of federalism, some State will always bear the distinction of treating particular offenders more severely than any other State." *Rummel v. Estelle,* 445 U.S. at 282, 100 S.Ct. at 1143 (footnote omitted).

When reviewing "sentences of imprisonment, the problem is ... one of line-drawing." *Solem v. Helm,* 463 U.S. at 294, 103 S.Ct. at 3012. As the Court of Appeals of Maryland stated: "Sentences in the group of states which take the lead in protecting

---

**26.** Tex.Penal Code Ann. §§ 12.32, 30.02 (Vernon 1974 & 1988 Cum.Supp.), Tex.Code Crim.Proc. Ann. art. 42.18, § 8 (Vernon 1988 Cum.Supp.).

**27.** The relevant statutes for these states are: Ala.Code §§ 13A–5–6(a)(1), 13A–5–9(a)(2), 15–22–28 (1982); Tex.Penal Code Ann. § 12.42(c) (Vernon 1974 & 1988 Cum.Supp.), Tex.Code Crim.Proc.Ann. art. 42.18, § 8 (Vernon 1988 Cum.Supp.).

**28.** The relevant statutes for these states are: Ala.Code §§ 13A–5–9(b)(2), 15–22–28 (1982); D.C.Code Ann. §§ 22–104a, 24–203(a) (1981); Idaho Code §§ 19–2514, 20–223(a) (1987); N.Y. Penal Law §§ 70.10, 70.40(1) (McKinney 1987); S.C.Code Ann. §§ 16–11–311(A)(2), 24–21–610 (Law. Co-op. 1987 Cum.Supp.); Tex.Penal Code Ann. § 12.42(d) (Vernon 1974 & 1988 Cum. Supp.), Tex.Code Crim.Proc.Ann. art. 42.18, § 8 (Vernon 1988 Cum.Supp.); Utah Code Ann. §§ 76–8–1001, 77–27–7 (1978 & 1987 Cum. Supp.).

**29.** W.Va.Code §§ 61–11–18, 62–12–13(a) (1984 & 1987 Cum.Supp.).

**30.** *See, e.g.,* Ala.Code §§ 13A–5–9(c)(2), 15–22–28 (1982) (mandatory life sentence with possible parole); Colo.Rev.Stat. §§ 16–13–101(2), 17–22.-5–104(2) (1986 & 1987 Cum.Supp.) (mandatory life sentence with possible parole); La.Rev.Stat. Ann. §§ 15:529.1(A)(3)(a), 15:574.4(B) (West 1981 & 1988 Cum.Supp.) (discretionary life sentence with parole possible only if life sentence commuted to a fixed term of years); Md.Ann. Code art. 27, § 643B(b) (1987) (mandatory life sentence without parole); Nev.Rev.Stat. § 207.010(2) (1985) (mandatory life sentence with discretionary parole); N.C.Gen.Stat. §§ 14–7.1, 14–7.6 (1986), 15A–1371 (1983 & 1987 Cum. Supp.) (discretionary life sentence with possible parole); S.D.Codified Laws Ann. §§ 22–6–1(3), 22–7–8, 24–15–4 (1979 & 1987 Cum.Supp.) (discretionary life sentence without parole); Vt. Stat.Ann. tit. 13, § 11 (1974), tit. 28, § 501(b) (1986) (discretionary life sentence with possible parole).

**31.** *See supra* note 30.

their citizens from habitual housebreakers do not become constitutionally suspect simply because a majority of states treat habitual housebreakers more leniently." *State v. Davis,* 530 A.2d at 1236.

"In construing 11 *Del.C.* § 4214(b) in the *Hall* case, we held that the legislature intended to reserve the [severe] habitual offender penalties for those individuals who were not rehabilitated after the specified number of separate encounters with the criminal justice system and a corresponding number of chances to reform." *Buckingham v. State,* Del.Supr., 482 A.2d 327, 330 (1984). Subsection (b) of the Delaware recidivist statute is narrowly directed towards repeat offenders of crimes involving death or danger to human life who, having been exposed to the correctional system on two separate and distinct occasions, have proven that they cannot peacefully coexist with society. *Cf. Montone v. State,* 308 Md. 599, 521 A.2d 720, 727 (1987). Our legislature has concluded that persons who qualify for punishment under 11 *Del.C.* § 4214(b) are incorrigible. *See Hall v. State,* 473 A.2d at 356. Therefore, the Delaware legislature has determined that, upon a third conviction for a specifically enumerated serious crime, habitual offenders shall receive "the harshest penalty short of death that a civilized society may impose—life imprisonment without possibility of parole." *Montone v. State,* 521 A.2d at 727.

The Delaware legislature's determination to draw the line as it did under 11 *Del.C.* § 4214(b) is justifiable because of the violent nature of the crimes involved. We defer to that determination. *See Solem v. Helm,* 463 U.S. at 290 n. 16, 103 S.Ct. at 3009 n. 16. "The Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how to best administer its criminal laws." *Spaziano v. Florida,* 468 U.S. 447, 464, 104 S.Ct. 3154, 3164, 82 L.Ed.2d 340 (1984).

Thus, based on our analysis of Williams' sentence pursuant to the *Solem* objective criteria, we hold that 11 *Del.C.* § 4214(b), as applied to Williams, does not impose an unconstitutionally disproportionate sentence in violation of the Eighth Amendment.

### Conclusion

The judgments of the Superior Court, which resulted in Williams' convictions and his sentencing as an habitual criminal, are AFFIRMED.