Edward L. SKINNER, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Alan T. BROOKS, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Edward E. SANDERS, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: April 24, 1990.
Decided: May 11, 1990.
Rehearing Denied June 25, 1990.

John S. Malik, Wilmington, for appellant Alan T. Brooks.

Howard F. Hillis, Wilmington, for appellant Edward E. Sanders.

Eugene J. Maurer, Jr., Wilmington, for appellant Edward L. Skinner.

Richard E. Fairbanks, Jr. (argued), Chief of Appeals Div., and Loren C. Meyers, Timothy H. Barron, Deputy Attys. Gen., Wilmington, for the State.

Before CHRISTIE, C.J., HORSEY, MOORE, WALSH, and HOLLAND, JJ. (constituting the Court en banc).

CHRISTIE, Chief Justice:

This is a consolidated appeal from criminal convictions in the Superior Court. A jury found the codefendants, Edward L. Skinner, Alan T. Brooks, and Edward E. Sanders guilty of robbery in the first degree, kidnapping in the second degree, and conspiracy in the second degree in connection with the robbery of Jose Grinage. They were found guilty of attempted robbery in the first degree, conspiracy in the second degree, possession of a deadly weapon during the commission of a felony, and murder in the first degree (felony/murder) in connection with the attempted robbery and murder of Ronald Irons.[1] Additionally, the jury found Sanders and Skinner guilty of robbery in the first degree, kidnapping in the second degree, and conspiracy in the second degree in connection with the robbery of James Yates. The jury acquitted Brooks on all charges connected with the Yates robbery. The jury also acquitted all three defendants of the charge of intentional murder of Irons. Sanders and Skinner were each sentenced to life imprisonment without parole plus 69 years, while Brooks was sentenced to life imprisonment without parole plus 52 years.

On appeal, defendant Brooks advances seven claims of error, six of which Sanders also advances, and two of which Skinner also advances. Brooks and Sanders contend that their convictions should be overturned because the trial court erred by (1) violating their constitutional right to a speedy trial; (2) denying a defense motion to sever the murder charges from the separate robbery charges; (3) denying a defense motion to sever defendant Skinner from the charges relating to the Grinage robbery because of a statement he made concerning the incident; and (4) permitting the jury foreman to remain on the jury panel after he disclosed that he was a social acquaintance of the State's chief investigating officer. Brooks also contends that the trial court erred by (5) denying his motion for judgment of acquittal on the charges stemming from the Grinage robbery. Finally, all three defendants contend that the trial court erred by (6) denying a defense motion for judgment of acquittal on the charges stemming from the charge of attempted robbery of Ronald Irons, and (7) denying a defense motion for mistrial after the State questioned a witness concerning a statement not provided to the defense in violation of Superior Court Criminal Rule 16.

### FACTS

Due to the nature of this case, we find it necessary to recite the facts in detail. On the morning of Friday, February 21, 1986, LaJuan Lum went to work at her job as a private duty nurse. Alan Brooks drove Lum to work in her car, a sky-blue 1985 Mercury Lynx. When Lum finished her half-day shift around 1 p.m., Brooks picked her up. The two did an errand and then Brooks took Lum to Emily Bissell Hospital where she worked the 3–11 p.m. shift. At the end of her shift, Brooks and Willie Chase were there in Lum's car to meet her. The three of them drove into Wilmington to

---

1. The defendants were initially indicted jointly with Michelle Burgos and Willie J. Chase. The charges against defendant Burgos were dropped prior to trial in exchange for her testimony as a State's witness. Defendant Chase was tried sep-

arately due to a potentially incriminating statement he made. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). At his trial, Chase was acquitted of all charges.

pick up Edward Skinner. Once they found Skinner, they all went to the Brass Monkey, a club in New Castle. Chase remained at the club while Brooks, Skinner, and Lum went to a house where Lum was staying. Brooks and Skinner dropped Lum off in the area of 25th and Madison Streets in Wilmington, then took her car. Lum remained there until the afternoon of Sunday, February 23, when Brenda Skinner, Edward Skinner's wife, came for her. During the period in which Lum was without a car, Brooks, Skinner, Chase, and Edward Sanders, according to the State, committed two robberies and, during an attempt to commit a third robbery, killed Ronald Irons.

### Robbery of Jose Grinage

On Friday afternoon, February 21, 1986, Michelle Burgos called up Jose Grinage, a friend of hers, and asked to borrow his car, a 1986 Chrysler LeBaron. Grinage brought the car to Burgos's house and Burgos and her companion, Kimberly Bronson, drove Grinage back to his apartment. Although Burgos and Bronson were to have borrowed the car for only a few hours, they kept the car until late the next morning. Before returning the car on Saturday, February 22, however, Burgos wanted to find someone to follow Bronson and her to Grinage's apartment in case Grinage was annoyed because his car had not been returned sooner. Between 10 and 11 a.m. on Saturday, Burgos found Chase, Skinner, Brooks, and Sanders in a light blue car near 9th and Washington Streets. Chase agreed to accompany the women and he rode with Bronson and Burgos, while the other three men followed.

When they arrived at Grinage's apartment, Burgos, Bronson, and Chase went inside. Burgos introduced Chase to Grinage. Soon afterwards Chase left the apartment, but he returned a little later to ask Grinage if he could borrow his car and be directed to a liquor store. Grinage refused to loan his car but gave him directions. Chase, however, wanted Grinage to show him the way to the store, and Grinage agreed. In the apartment parking lot, Chase asked if he could ride with Grinage. Although Grinage initially said no,

he eventually agreed to let Chase come with him. Chase then walked over to the other car, which contained three black males, to talk with the occupants. He and Skinner then walked over to Grinage's car. Chase entered the car, and Skinner, in the course of continuing his conversation with Chase, asked Grinage if the liquor store had a large amount of cash on hand. Grinage and Chase then drove off, Grinage noting that the other car followed them out of the parking lot.

On the way to the liquor store, Chase told Grinage that the four men wanted Grinage to help them rob the store. Grinage refused to do so, and Chase did not pursue the topic. When Grinage and Chase arrived at the store, Grinage, but not Chase, went into the store. When Grinage came out of the liquor store, he saw neither Chase nor the other men, and he went to a nearby delicatessen to buy cigarettes. When Grinage returned, he saw Chase in the front passenger seat of his car. When he opened the door, Sanders sat up in the backseat brandishing a pistol and ordered Grinage to get into the car.

Grinage complied and began to drive back to his apartment. He had not seen the other car when he left the liquor store, but as he drove away with Chase and Sanders, he saw the car come from the parking lot of a nearby convenience store and follow his car. Near the intersection of Churchman's and Airport Roads, Grinage was ordered to pull his car onto the shoulder. The other car then stopped behind Grinage. Grinage attempted to escape, but Sanders threatened to shoot him if he fled. Chase and Sanders then took $5 in cash, two watches, Grinage's car keys, and his class ring. Sanders threw the keys into the brush and he and Chase joined the other two men in the other car and left. After unsuccessfully searching for the keys, Grinage walked to a phone and called the police. A search of Grinage's car uncovered a gray pouch containing .45 and .22 caliber bullets and an unopened pack of cigarettes; Sanders' left thumbprint was found on the cigarette pack. Police accompanied Grinage back to his apartment

where Bronson and Burgos were still waiting. Both of the women were questioned and later released.

Later that afternoon, three black males appeared at Merrill's Antiques and Jewelry store in Elsmere and attempted to sell Grinage's class ring. Two of the men first went into the store, and based on prior transactions, the clerk recognized one of the men as Skinner. Because Skinner did not have a photo identification, the ring could only be pawned, not sold. Skinner and his companion left, but shortly afterwards, Skinner and Brooks entered the store, saying they had decided to sell the ring. Brooks produced his Delaware driver's license, the transaction was completed, and Skinner and Brooks left the store.

### Robbery of James Yates

On the evening of Saturday, February 22, 1986, James Yates was staying at Motel 6 in New Castle County. At about 9 p.m., Yates was in the hotel lobby drinking from a bottle of wine. As he stood in the lobby, a black male, later identified by Yates as Sanders, approached Yates and asked for change. Yates gave him the change and the two talked for a few minutes. Yates then placed his wine on the top of a cigarette machine in the lobby and went to make a phone call. When he returned to the lobby, both his wine and Sanders were gone.

Yates walked out of the motel to a nearby McDonald's to get something to eat. He then went to a nearby liquor store, where he bought a pint of peppermint schnapps. As Yates walked out of the store, he saw Sanders, who was holding the bottle of wine. Sanders was walking back to what Yates described as a small white car. He asked if Yates wanted to meet the driver of the car. As Yates reached into the car from the passenger's side to shake hands with the driver, he saw that Sanders had a gun. Sanders ordered Yates to get into the car. A man in the back seat got out of the car, and Yates got in the middle of the back seat, sandwiched between two men. The men then drove around with Yates for several minutes. Yates was told to put his head down and not look up, so he

did not know where they went. During the drive, Yates noticed that each of the three passengers had a pistol. They took Yates's cash (approximately $30), his high school class ring, a necklace, and the bottle of peppermint schnapps. Yates was then allowed to leave the car and was told that if he called the police or turned around as the men drove away, he would be killed. Yates made his way back to the motel and called the police. His class ring was found the next morning by Wilmington police in front of the William Irons residence at 337 South Heald Street.

### Killing of Ronald Irons

As noted above, Kimberly Bronson and Michelle Burgos had been detained by police on Saturday afternoon after Grinage had been robbed, not only for questioning, but also on the basis of outstanding warrants. Burgos was released from a Justice of the Peace Court about 10 p.m. and eventually reached her house where she saw her sister Mona just coming home. The two then went to the Wilmington Police Department to inquire about Bronson. Bail had not yet been set for Bronson, and they left the police station without her.

From the police station, Mona and Michelle went to the house of William Irons at 337 South Heald Street in Wilmington. Michelle had given Irons a watch as payment for some cocaine which she had purchased from him, and she now wanted to redeem the watch.

When Michelle went into the house, Irons was engaged in a drug sale with Curtis Williams and Robert Dixon. Williams and Dixon left the house about five minutes later. As the two men left, they saw two cars, one parked around the corner on A Street, west of Heald, and one in front of the Irons house with Mona in the front seat. Walking to their car, Dixon heard Edward Sanders shout to him from across the street, and Williams was called by Edward Skinner over to the car parked on A Street. Dixon simply acknowledged Sanders' shout with a wave of his hand and a shouted greeting. Williams walked over to Skinner and engaged in a brief conversa-

tion. Williams then returned to the car where Dixon and another man were waiting, and the three drove away.

Mona, who was double-parked on Heald Street in front of the Irons house, saw Dixon and Williams leave, and as they walked away, she testified that she saw them stop at the corner to talk with three men. Those three men, whom she identified as Chase, Sanders, and Brooks, then walked past her car, turned around, and walked up to the house. Mona saw the door to the house open slightly and, a brief time later, the three ran down A Street in a westerly direction. Though Mona did not hear anything because she was playing the car radio as she waited, she saw William Irons run out of the house. At that point, she got out of the car and ran to the front door of the house. Michelle ran out of the front door, stumbling over the body of Ronald Irons, a son of William Irons. She and her sister drove away. As they turned right from Heald Street onto A Street, heading westbound, both of them saw Skinner in the driver's seat of a car parked on A Street, though they did not see the other three men.

Michelle Burgos testified that when she entered the Irons house, William Irons was engaged in a drug transaction with Williams and another man she did not recognize. Irons told her to wait until he was done with the two men, and she went into the kitchen. Williams and his companion soon left, and Irons joined her in the kitchen. While she and Irons were in the kitchen, they heard gunfire. Irons ran toward the front of the house, and Michelle attempted to leave through the back door. Finding the door locked, Michelle hid under the kitchen table. Irons soon returned and told her to get out of the house. She saw and heard Mona at the front door, shouting for her to leave. As she walked through the house, she saw Ronald lying near the front door.

According to Irons, however, Michelle had arrived at the house shortly after Williams and Dixon had left. Irons told her that there was a soda in the refrigerator, and Michelle had gone into the kitch-

en while he and Ronald stayed in the living room, watching television. A few minutes later, the doorbell rang and Ronald answered the door. Because the door was not wide open, Irons could not see who was at the door, but he did not notice any sign of trouble. As he continued to watch television, Irons next heard a moped, located about five feet from the door, fall over. As he began to shout at Ronald about knocking down the moped, he heard gunfire. He rushed to Ronald, whom he saw lying on the floor, and he saw two men leaving through the door. He let Ronald go and ran outside to look for the attackers. He saw no one, so he returned to the house and called the police. Police later found a .32 caliber revolver, without any shells in the cylinder, lying on the ground near the steps to the house. Ronald had been shot in the head with a small caliber pistol and died the next day.

When Brenda Skinner met LaJuan Lum on Sunday afternoon, the two women unsuccessfully searched for Lum's car. After their futile search, they picked up Chase, and the three of them went to St. Francis Hospital to get Brooks, who was visiting Darneise Goodman.

Goodman testified that during his visit, Brooks told her that he thought "he got himself a body." Goodman interpreted this to mean that Brooks had shot a man. Brooks also told Goodman that he had done something in Newark with Lum's car, which he had had all weekend, and he believed that the police were looking for the car. When, according to Goodman, Lum confronted Brooks at the hospital about her car, Brooks assaulted Lum outside the hospital and told her that Skinner had the car.

Brooks, Chase, Lum, and Brenda Skinner eventually left the hospital and returned to Brenda's house. About 8 p.m. Sunday evening, Lum borrowed Brenda's car and went to the neighborhood of 25th and Jessup Streets to look for her car. As she drove through the area, she saw Skinner come out of a house. She stopped and Skinner got into the car. A block further, they saw

Lum's car. They took the two cars back to Brenda's.

Police obtained a warrant to search Skinner's residence on February 25 and he was arrested that day. In a statement to police, Skinner acknowledged that during the Grinage robbery, he had been driving Lum's car, but he did not realize that the others had planned to rob Grinage. Similarly, he was the driver of Lum's car during the robbery of Yates, but he was not a participant. Skinner also referred to Yates as a "hillbilly" and mentioned that they had obtained a mint-flavored alcoholic beverage from Yates. Finally, Skinner told police that he had been in the area of Heald and A Streets on Saturday night with Lum's car. He said he had gone to the house of a third person to use cocaine, and when he returned to the car, he noticed police and an ambulance in the area.

Brooks became a suspect by police shortly after the shooting, and he surrendered about two weeks later. According to Goodman, Brooks and his family contacted her about being an alibi witness for Brooks at the time of the murder. Goodman refused since it was obvious that visiting hours at St. Francis would have ended several hours before the shooting. According to Brooks's sister, however, Brooks had been with her and another woman most of the evening, leaving between 10:15 and 10:30 p.m. to go to his mother's house in order to report to Plummer Center authorities between 11 p.m. and midnight.

Sanders was arrested in March, 1986. According to William Miller, a defense witness, he and his sister saw Sanders on the Third Street bridge in Wilmington sometime on the night of the murder. They stopped the car to give Sanders a ride, and they took him to LeRoy's Bar near 13th and Claymont Streets, where Dixon saw him shortly after Dixon had left the Irons house.

## I.

■ Appellants Brooks and Sanders first contend that the delay between the time of their arrest and trial was so long that it violated their right to a speedy trial under the Sixth Amendment to the United States Constitution and Article I, Section 7 of the Delaware Constitution.[2] The right of a defendant to a speedy trial under Article I, Section 7 of the Delaware Constitution corresponds to his right under the Sixth Amendment to the United States Constitution. *Fensterer v. State*, Del.Supr., 493 A.2d 959, 964, *rev'd on other grounds*, 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). Thus, our consideration of the State constitutional issue will parallel our consideration of the claim under the United States Constitution. *Id.* at 964–95; *Bailey v. State*, Del.Supr., 521 A.2d 1069, 1079 (1987).

■ Whether a violation of a defendant's speedy trial rights has occurred depends upon the facts of the individual case. *Stacey v. State*, Del.Supr., 364 A.2d 819, 820 (1976) (citing *Beebe v. State*, Del.Supr., 346 A.2d 169, 172 (1975)). In the case of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court rejected firm, inflexible approaches in favor of a balancing test, in which the conduct of the prosecution and the defendant are weighed to determine whether a speedy trial violation has occurred. *Id.* at 529–30, 92 S.Ct. at 2191–92, 33 L.Ed.2d at 115–16. The factors to be weighed include the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Id.* at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117; *Fensterer*, 493 A.2d at 965.

■ The threshold consideration is the length of the delay. Unless "there is some delay which is presumptively prejudicial," there is no reason to review the other factors. *Scott v. State*, Del.Supr., 521 A.2d 235, 239 (1987) (quoting *Barker v. Wingo*, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d

---

**2.** The Sixth Amendment to the United States Constitution provides in relevant part:
 In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. . . .

Article I, section 7 of the Delaware Constitution provides in relevant part:
 In all criminal prosecutions, the accused hath a right . . . to have . . . a speedy and public trial. . . .

at 116). Sanders was arrested on March 4, 1986 and Brooks was arrested on March 13, 1986. Their trial commenced on March 2, 1987. Thus, the applicable period of delay is approximately one year. There is no precise time period which uniformly triggers a speedy trial analysis. A longer period of delay can be tolerated for serious, complex charges, such as murder in the first degree and multiple conspiracies, with which both Brooks and Sanders were charged. *Barker v. Wingo*, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 116. Nonetheless, the State concedes that the period of time involved in this case is facially sufficient to provoke inquiry into the remaining factors.

That being the case, this Court must examine the other three factors of the balancing test as they are reflected in the record of this case. The court docket shows that four defendants were originally arrested in the spring of 1986 and arraigned for the offenses involved in these events. As of May 1, upon motion by the State, a separate trial was scheduled for Willie Chase for September 15, 1986. The months preceding that date were taken up with various motions by the defendants' attorneys for discovery, separate juries, severance of charges, sequestration of the jury, prohibition of seeking the death penalty, bail reduction, and *voir dire* requests. Each of these motions was made for the benefit of the defendants and cannot be viewed as anything other than pretrial preparation. The Chase trial was held in September. Severing the Chase trial unquestionably benefitted the State because if he had been convicted, Chase's testimony could have been used at the trial of the other three defendants. On the other hand, the constitutional rights of the defendants to confront their accusers would have been jeopardized if Chase were not tried separately. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Any delay caused by the Chase trial, therefore, had mixed benefits to all the parties. In fact, Chase was acquitted of all charges, which arguably damaged the State's case more than it damaged the defendants' case.

The first trial date of the remaining three defendants was set for December 1, 1986. The trial records reflect that the defendants requested a new date of January 12, 1987 for additional preparation time. Prior to December 1, 1986, the State changed the prosecutor assigned to the case. Defendants argue that this change caused the rescheduling, but the court records make it clear that the new date was requested by the defense and not by the State. On November 24, 1986, the court indicated that due to an internal scheduling conflict of the court, the trial would be rescheduled for March 2, 1987. This delay is the only one which can be laid exclusively at the feet of the State, but under the circumstances the delay is less significant than a delay caused by a deliberate act of the prosecutor. *Barker v. Wingo*, 407 U.S. 514, 531, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117 (1972).

The third factor to be balanced is whether the defendants asserted their right to a speedy trial during the delay. Defendant Brooks filed a *pro se* motion for a speedy trial on June 8, 1986. His counsel filed a speedy trial motion on his behalf on July 18, 1986. These prior motions operate in his favor in the balancing of factors. Defendant Sanders did not file any motions for a speedy trial on his own behalf, and the State argues that his appeal on this issue should be denied summarily for that reason. Supr.Ct.R. 8. While that may be the case, we decline to rest our analysis exclusively on a procedural error in a complicated defense by court-appointed counsel. Rather, we shall consider Sanders' failure to assert his demand for a speedy trial as a factor weighing heavily against the claim that he now makes.

■ The fourth factor, prejudice to the defendants caused by the delay, "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." *Barker v. Wingo*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. The United States Supreme Court described those interests to be "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of

the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* As to the first interest, Brooks and Sanders were both incarcerated pending trial, but in Brooks's case, it appears that he was serving a sentence on a prior offense as well. Sanders made no particular argument that his incarceration was oppressive. Regarding the second interest, there is no evidence that either defendant suffered extraordinary anxiety as a result of the delay. Whether the defense itself was impaired is the most serious interest which must be protected to insure fairness. *Id.* Neither defendant argues that any of his witnesses were unavailable as a result of the delay. *See Bailey v. State*, Del.Supr., 521 A.2d 1069, 1083 (1987). Brooks argues, rather, that the delay caused an additional witness, Darneise Goodman, to be available to the State. On November 18, 1986, Goodman gave a statement to the police regarding Brooks's admission to her of his involvement in the charged offenses. This statement was used against Brooks in the trial. If his trial had proceeded on September 15, 1986, as originally scheduled, Brooks argues that this witness would not have been available to the State, and thus the delay resulted in a detriment to his defense. The harm to the defendant which the speedy trial right protects, however, is not that the delay may cause new witnesses to emerge for the State, but that witnesses for the defense might disappear. If the Goodman testimony had been to the benefit of Brooks's case, there would certainly be no argument here. If, however, an existing witness for either side had become unavailable during the delay, there may have been prejudice.

Balancing all of the factors presented, the scale tips against the defendants. Although the delay was for one year, the reasons for that delay primarily benefited the defendants. The delay caused by the separate Chase trial, although moved by the State, protected the defendants' constitutional right of confrontation and produced an outcome which was no more beneficial to the State than to the defendants. Brooks assuredly asserted his right to a speedy trial. Sanders, by not independently asserting this right, makes a much harder case for himself. *Barker*, 407 U.S. at 531–32, 92 S.Ct. at 2192–93, 33 L.Ed.2d at 117–118. Neither defendant has shown convincing evidence that the delay prejudiced his ability to adequately prepare his defense. Showing that one witness against Brooks became available to the State prior to the first trial date of these defendants does not prove prejudice. Accordingly, we affirm the decision of the Superior Court and find no abuse of discretion in its ruling which found no violation of defendants' right to a speedy trial.

## II.

■ Defendants Brooks and Sanders next contend that the trial court erred in denying their motion to sever the charges of the robberies of Grinage and Yates from the charge of felony murder and intentional murder of Irons. They first argue that the charges were misjoined and second, that joinder made it more likely that the jury would cumulate evidence of the various offenses and would infer a criminal disposition on the part of the defendants.

Under Superior Court Criminal Rule 8(a) [3], a defendant may be tried simultaneously for two or more offenses if the offenses are "of the same or similar character," or are "based on [two] or more acts or transactions connected together or constituting parts of a common scheme or plan." If, however, the trial court finds that a joinder of offenses will prejudice either party, it may sever offenses.[4] Su-

---

**3.** Superior Court Criminal Rule 8(a) states:

*Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan.

**4.** Superior Court Criminal Rule 14 states:

If it appears that a defendant or the State is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the Court may order an election or separate trials of counts,

per.Ct.Crim.R. 14. Such decision lies within the sound discretion of the trial court and will not be overturned, absent a showing of prejudice by the defendant. *Younger v. State*, Del.Supr., 496 A.2d 546, 549–50 (1985) (citing *Lampkins v. State*, Del.Supr., 465 A.2d 785, 794 (1983)).

In determining whether the trial court abused its discretion, it is necessary to examine the facts in each case. *Younger*, 496 A.2d at 550. As a general rule, it may be said that discretion has been abused by denial when there is a reasonable probability that substantial prejudice may result from a joint trial. *Bates v. State*, Del.Supr., 386 A.2d 1139, 1141 (1978). The defendant has the burden of demonstrating such prejudice and mere hypothetical prejudice is not sufficient. *Id.* at 1142. While this Court is aware of the potential for prejudice inherent in a joint trial of separate offenses, we find no abuse of discretion or prejudice to the defendants in the trial court's denial of their motion for severance.

In this case, the robberies of Grinage and Yates and the murder of Irons all occurred on February 22, 1986. The Grinage robbery occurred at approximately 1:35 p.m., the Yates robbery at approximately 9 p.m., and the attempted robbery and murder of Irons at approximately 11:50 p.m. It appears that the defendants were embarking on a "crime spree" on this particular date. The first two robberies were sufficiently similar in character to warrant joinder, and the defendants do not dispute this finding. We rule that the charges of attempted robbery and felony murder of Irons also warrant joinder in this case. The short period of time that elapsed between the Grinage robbery, the Yates robbery, and the Irons incident makes it clear to this Court that the offenses involve a similar course of conduct within a relatively brief span of time and were properly joined. *See Brown v. State*, Del.Supr., 310 A.2d 870, 871 (1973). The mere fact that

the crimes were "separate", and were committed against different individuals with a lapse of time between them, does not require severance. *McDonald v. State*, Del. Supr., 307 A.2d 796, 798 (1973).

Further, evidence of the Grinage and Yates robberies could have been admissible in a separate trial which involved the attempted robbery and murder of Irons in order to establish defendants' intent at the time of the attempt to rob Irons. *See Winestock v. United States*, D.C.Ct.App., 429 A.2d 519, 525 (1981). Although reciprocal admissibility is not a prerequisite for initial joinder, reciprocal admissibility is a pertinent factor for the trial court to consider.

We next address the contention that defendants suffered prejudice as a result of the joinder. We find this contention to be without merit. Defendants argue that they suffered prejudice because a jury was required to consider all three incidents at one trial. They contend that the jury would have difficulty differentiating among the many counts of the indictment. The cumulative effects of the evidence would thus connect the defendants to each separate charge or allow an inference that they had criminal dispositions. The defendants cite *State v. McKay*, Del.Super., 382 A.2d 260 (1978), in support of this contention. In the *McKay* case, eight separate indictments were involved, with nine different individuals, for a total of 35 counts against one defendant. The Superior Court granted the defendants' motion to sever the offenses based upon the "sheer mass" of the charges and held that it would be extremely unlikely that a jury would be able to resist the cumulative effect of the evidence. *Id.* at 262.

In this case, three defendants were allegedly involved in three incidents which occurred during a 10½ hour time span. The trial judge instructed the jury that the evidence of each offense was to be considered separately. The jury acquitted Brooks of

grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the Court may order the attorney for the State to

deliver to the Court for inspection in camera any statements or confessions made by the defendants which the State intends to introduce in evidence at the trial.

all involvement in the Yates robbery and acquitted all three defendants of the intentional murder of Ronald Irons. We are of the opinion that under the circumstances the jury was able to distinguish the offenses and segregate the evidence. We find no abuse of discretion in the trial court's failure to sever the offenses.

### III.

■ Defendants Brooks and Sanders next contend that the trial court erred in denying their motions to sever their trials from that of Skinner. Prior to trial, defendants had moved for severance on the ground that there was no other effective means to avoid confusion of the jury that would result from a joint trial. They further argued that a statement made by Skinner to Detective Richard Kilmon of the Wilmington Police Department implicated them in the Grinage robbery by association with Skinner. In the absence of that statement, they contend that no other substantive, competent evidence existed to show guilt on the part of Brooks and Sanders. The State contends that there existed substantial, additional evidence to place both Brooks and Sanders at the scene of the Grinage robbery. We agree with the State and find no abuse of discretion on the part of the trial court.

Under Superior Court Criminal Rule 8(b)[5], two or more defendants may be charged in the same indictment if they are alleged to have participated in the same act or in the same series of acts. If, however, the trial court finds that a joinder of defendants for trial will prejudice any of the parties, it may sever the charges. Super. Ct.Crim.R. 14.[6]

■ A motion for severance is addressed to the sound discretion of the trial court. Ordinarily, defendants indicted jointly should be tried together; but, if justice requires it, the trial court should grant separate trials. *Jenkins v. State*, Del.Supr., 230 A.2d 262, 272 (1967). What constitutes abuse of discretion depends upon the facts and circumstances of each case. *Id.* As a general rule, it may be said that discretion has been abused by denial of severance when there is a reasonable probability that because of a codefendant's extra judicial statement, substantial injustice and denial of a fair trial may result from a joint trial. *Lampkins v. State*, Del.Supr., 465 A.2d 785, 794 (1983) (citing *Jenkins*, 230 A.2d at 273).

In his *voir dire* examination, Detective Kilmon stated that codefendant Skinner had admitted that he was present at the Grinage robbery, along with codefendants Brooks and Sanders. Detective Kilmon's direct testimony before the jury, however, involved a redacted statement which removed all references to the other defendants. Therefore, a separate trial was not required merely because Skinner gave a statement to the detective at an earlier time. Severance was required only if some other factor were present, such as: 1) absence of other substantial, competent evidence of the movant's guilt; 2) antagonistic defenses as between the codefendant and the movant; and 3) difficulty of segregating the evidence as between the codefendant and the movant. *Jenkins*, 230 A.2d at 273. Brooks and Sanders contend that no other substantial, competent evidence existed to link them to the Grinage robbery. They also argue that the jury would have difficulty segregating the evidence and they would be found guilty by association with Skinner. We disagree with these arguments and find that sufficient evidence did exist to prove the individual guilt of all three defendants.

The facts indicate that Sanders and Brooks were present at the Grinage robbery. Michelle Burgos and Kimberly Bronson both testified that they met Chase,

---

**5.** Superior Court Criminal Rule 8(b) states:

*Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

**6.** See footnote 4, *supra,* for the text of Superior Court Criminal Rule 14.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Brooks, Skinner, and Sanders on Saturday morning, February 22, 1986, in Wilmington. Chase accompanied the two women to Grinage's apartment in Grinage's car, while Skinner, Brooks, and Sanders followed them in another vehicle. Further, Grinage testified that Chase told him that the four men wanted him to help them rob a liquor store. Grinage refused to do so, but when he returned to his car after buying cigarettes at a delicatessen, Chase and Sanders were in his car. Sanders held a pistol and ordered Grinage to get into the car. Grinage was then ordered to drive and then later to pull over onto the shoulder of the road. During this time, the other vehicle with the two men inside had been following Grinage, Chase, and Sanders. Chase and Sanders then robbed Grinage. Grinage specifically identified Sanders at trial. Later that same afternoon, Skinner and Brooks sold Grinage's class ring at a pawn shop in Elsmere. Brooks° produced his driver's license in order to effectuate the sale.

The evidence presented to the jury against Brooks and Sanders is more extensive than the limited evidence presented to the jury in the *Jenkins* case. In the *Jenkins* case, we ruled that the trial court abused its discretion in denying the motion for severance, based on the fact that there existed no other substantial, competent evidence against a codefendant except for the statement of another codefendant. That is not the case here. Since neither Brooks nor Sanders would have been tried for the Grinage robbery based solely on Skinner's statement, which was ultimately redacted, we find no error on the part of the trial court in its decision not to sever the codefendants.

▮▮▮ As we noted earlier, the likelihood of confusion (and therefore prejudice) to either Brooks or Sanders was also minimized by the cautionary instructions the jury received from the trial judge. The jury was told to consider the liability of each defendant separately and that evidence admitted against one defendant was not to be used in determining the guilt of the other defendants. We find that the instructions were sufficient to eliminate the potential "spillover" effect resulting from the joint trial. *Lampkins*, 465 A.2d at 795. *See also United States v. Cresta*, 1st Cir., 825 F.2d 538, 554–55 (1987).

## IV.

▮▮▮ Brooks and Sanders also contend that the trial court abused its discretion by permitting the foreman of the jury to remain on the jury panel after he had disclosed that he was a social acquaintance of Detective Richard Kilmon, the State's Chief Investigating Officer in the Irons murder. The State argues that the juror was merely a casual acquaintance of Kilmon's and therefore it was not necessary for him to be removed as a juror in this case. We agree with the State and find no abuse of discretion in allowing the jury foreman to remain.

▮▮▮ The mere fact that a juror is a casual acquaintance of a witness is not a basis for automatic disqualification. *Weber v. State*, Del.Supr., 547 A.2d 948 (1988); *Holmes v. State*, Del.Supr., 422 A.2d 338, 342 (1980). Further, it is not an abuse of discretion to impanel a juror with a law enforcement affiliation when the juror indicates an ability to be impartial. *Bailey v. State*, Del.Supr., 490 A.2d 158, 165–66, *cert. denied*, 464 U.S. 867, 104 S.Ct. 205, 78 L.Ed.2d 178 (1983). The determination of a juror's impartiality is the responsibility of the trial judge who has the opportunity to question the juror, observe his or her demeanor and evaluate the ability of the juror to render a fair verdict. *Weber*, 547 A.2d at 953; *Hughes v. State*, Del.Supr., 490 A.2d 1034, 1041 (1985).

In this case, the trial court, after learning that the foreman of the jury knew Detective Kilmon, conducted *voir dire* of that juror. The juror stated that Kilmon had at one time lived with some good friends of his before he (Kilmon) was married. The juror's contact with Kilmon, however, had been limited to a few unplanned encounters with Kilmon at a bar. He stated in answer to a question regarding whether his relationship with Kilmon would influence him in any way, "I don't

believe so, no." During the course of the questioning by defense counsel and the court, the juror also stated that his uncle had been a state policeman for many years. Upon the conclusion of *voir dire*, the trial judge, in the exercise of his discretion, permitted the juror to remain, but he also noted that the defense could renew any objection "based upon Kilmon's testimony" if a problem arose at a later time. At the conclusion of the trial, defendants renewed the objection, but the court decided that "nothing that Sergeant Kilmon testified to was controverted by argument [of defense counsel]."

■ A decision not to discharge a juror following *voir dire* into an incident will not be overturned without a showing of a prejudicial abuse of discretion by the court. *Williams v. State*, Del.Supr., 494 A.2d 1237, 1243 (1985); *see also Styler v. State*, Del.Supr., 417 A.2d 948, 953 (1980). In view of the jury foreman's responses to questioning, we find that the trial judge's finding that his ability to render an impartial verdict had not been compromised does not amount to an abuse of discretion.

## V.

■ Defendant Brooks contends that the trial court erred by denying his motion for judgment of acquittal on the charges stemming from the Grinage robbery. We find this contention to be without merit.

■ "When a defendant argues that the evidence is insufficient to support a guilty verdict, 'the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Williams v. State*, Del.Supr., 539 A.2d 164, 168 (1988) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)). However, the Court is not required to ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt. It must merely inquire as to whether *any* rational trier of fact could have found that guilt was established. *Colvin v. State*, 299 Md. 88, 472 A.2d 953, 964 (1984). In doing so, the Court does not distinguish between direct and circumstantial evidence. *Williams*, 539 A.2d at 167 (citing *Holland v. United States*, 348 U.S. 121, 139, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954)).

Brooks was convicted of robbery in the first degree, kidnapping in the second degree, and conspiracy in the second degree in connection with the Grinage incident. To establish Brooks's liability for the robbery and kidnapping charges, it is necessary to show that Brooks intended to facilitate or promote the offenses and agreed to aid the other codefendants in the commission of the crimes. 11 *Del.C.* § 271(2)(b).[7]

To sustain Brooks's conspiracy conviction, it is necessary to establish not only his intent to promote or facilitate the robbery of Grinage and his agreement to aid the others, but also the commission of an overt act toward robbery by one of his fellow conspirators or by Brooks himself. 11 *Del.C.* § 512(1);[8] Delaware Criminal Code

---

7. 11 Del.C. § 271. *Liability for the conduct of another—Generally.*
 A person is guilty of an offense committed by another person when:

 . . . . .

 (2) Intending to promote or facilitate the commission of the offense he:

 . . . . .

 (b) Aids, counsels or agrees or attempts to aid the other person in planning or committing it ...

8. 11 *Del.C.* § 512. *Conspiracy in the second degree.*
 A person is guilty of conspiracy in the second degree when, intending to promote or facilitate the commission of a felony, he:

 (1) Agrees with another person or persons that they or 1 or more of them will engage in conduct constituting the felony or an attempt or solicitation to commit the felony; or

 (2) Agrees to aid another person or persons in the planning or commission of the felony or an attempt or solicitation to commit the felony; and he or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

with Commentary 142–45 (1973). As we discussed in Section III of this opinion, there was no direct evidence of Brooks's intent or his agreement to participate in the Grinage robbery. However, sufficient circumstantial evidence existed (such as Brooks's conduct later that day and his association with Sanders and Skinner) from which the jury could infer Brooks's intent and the existence of an agreement regarding the Grinage incident. First, there was substantial evidence establishing Brooks's presence at the Grinage robbery. As noted, Michelle Burgos and Kimberly Bronson testified that they met Chase, Brooks, Sanders, and Skinner on Saturday morning in Wilmington, and the four men went with the women to Grinage's apartment in the Newark area. There was no indication that Brooks somehow left the car before the group reached Grinage's apartment. A car containing three black males followed Grinage and Chase out of the apartment parking lot on their way to the liquor store. Further, after Chase and Sanders had ordered Grinage to drive away from the liquor store, Grinage saw Lum's car, containing two men, follow his car. From this evidence, the jury could conclude that Brooks was in the car throughout the entire incident.

Though "mere presence at the scene of the crime, without more, is insufficient to establish complicity," *Williams,* 539 A.2d at 167, the jury had before it more than evidence of Brooks's presence. The jury had heard from Grinage that Chase had sought his participation in the robbery of the liquor store, and Skinner had asked about the amount of cash in the store. Grinage also testified that Chase, prior to Skinner's inquiry, had been talking to the other three men, and Skinner, after asking Grinage his question, returned to the car. As noted, Chase and Grinage drove off and Skinner, Brooks, and Sanders followed them in Lum's car. From these facts, the jury could conclude that there was a plan to rob the liquor store and that Brooks,

present throughout the discussion, knew of the plan.

However, when Grinage refused to cooperate in the liquor store robbery, the men devised a new plan. Sanders hid in the rear seat of Grinage's car with a pistol, and Skinner and Brooks followed Grinage's car. Based on Brooks's presence in Lum's car, the jury could conclude that he was aware of the plan to rob Grinage, intended to facilitate or promote it, and agreed to aid the other three men. *See Smith v. State,* 57 Ala.App. 151, 326 So.2d 680, 685 (1975); *Landrum v. State,* 167 Ind.App. 304, 338 N.E.2d 666, 670 (1975); *State v. Garretson,* Minn.Supr., 293 N.W.2d 44, 45 (1980); *State v. Bonrud,* S.D.Supr., 246 N.W.2d 790, 793 (1976). Finally, shortly after Grinage was robbed, Skinner and Brooks sold Grinage's ring to a pawnbroker. Based on this evidence, we find no abuse of discretion in the trial court's denial of Brooks's motion for acquittal.

## VI.

■ Defendants Brooks, Sanders, and Skinner next contend that the State failed to establish a *prima facie* case regarding the attempted robbery of Ronald Irons. Therefore, they argue that the trial court erred in denying their motions for a judgment of acquittal on this charge and the other charges arising from the Irons incident. The State contends that the evidence presented to the jury and the inferences drawn therefrom were sufficient to sustain the convictions of all the defendants. We agree with the State and find no abuse of discretion in the trial court's denial of the motions.

We have previously set out the standards used by this Court to establish the sufficiency of evidence. A person is guilty of an attempt to commit a crime if he intentionally does something which is a substantial step in a course of conduct planned to culminate in his commission of the crime.[9]

---

9. 11 *Del.C.* § 531 states:
 *Attempt to commit a crime.*
 A person is guilty of an attempt to commit a crime if he:

(1) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or

A substantial step is "an act or omission which leaves no reasonable doubt as to the defendant's intention to commit the crime which he is charged with attempting." 11 *Del.C.* § 532.

We will first address the evidence presented to the jury regarding Brooks and Sanders' conduct immediately prior to the death of Ronald Irons. The State's case against Brooks and Sanders consisted of a series of facts and the inferences which flowed from those facts. The jury heard testimony that neighborhood residents knew that William Irons both sold drugs and acted as a neighborhood pawnbroker. Michelle Burgos testified that she had purchased cocaine from him several times. Since the police recovered Yates's ring in front of the Irons house, the jury could reasonably infer that the men took the ring with them and intended to gain entry to the house on the pretense that they wanted to dispose of the ring for money or drugs.

The jury also heard testimony that Chase, Brooks, and Sanders had stopped and talked to Williams and Dixon who had just left the Irons house. Therefore, it was reasonable to infer that the trio knew or had reason to believe that Irons had cash or drugs, or both, at the house. In fact, Irons testified that he had $1,700 in cash in the room where his son was killed. The jury also heard Mona Burgos's statement that shortly after she saw Chase, Brooks, and Sanders go to the front door and the door open slightly, the three men ran off. William Irons testified that he first heard the moped fall and then heard gunfire. Darneise Goodman stated that Brooks told her the next day that he thought he killed a man. Based on these facts, the jury could conclude that after the trio had shown Yates's ring to Ronald Irons in an effort to

enter the house, Irons somehow resisted and was pushed back into the room, causing the moped to fall. One of the trio pulled the trigger of the pistol he was holding and the three men then fled. A pistol which was traced to Chase was found in front of the house by the police as was Yates's ring.

In addition, the jury heard evidence from which it could conclude that Brooks had participated in the Grinage robbery (see Section V, *supra*) and, in turn, had planned to rob the occupants of the Irons house. *See Miller v. State,* Ala.Crim.App., 405 So.2d 41, 46–47 (1981) (admission of other crimes properly admissible as part of *res gestae,* in that all of the criminal acts were part of one continuous criminal adventure by the same parties occurring within a matter of hours); *State v. Frezal,* La.Supr., 278 So.2d 64, 70–72 (1973) (evidence of prior rape admissible to establish attempted rape as predicate felony for felony murder); *Simms v. State,* 39 Md.App. 658, 388 A.2d 141, 146–68 (1978) (evidence of prior rape and attempted rape admissible to establish attempted rape as predicate felony for felony murder).

We hold, too, that there was sufficient evidence presented from which the jury could infer the existence of a plan to rob the occupants of the Irons house based on the conduct of Sanders. Sanders was identified by Grinage as one of the men who robbed him in the afternoon of February 22. Later that same day, another robbery was committed, and the victim, Yates, testified that Sanders was the man who robbed him. Because of his direct participation in the Grinage and Yates robberies, the jury could reasonably infer that Sanders planned to commit yet another robbery at the Irons house. *See* 11 *Del.C.* § 307 [10];

(2) Intentionally does or omits to do anything which, under the circumstances as he believes them to be, is a substantial step in a course of conduct planned to culminate in his commission of the crime.

Attempt to commit a crime is an offense of the same grade and degree as the most serious offense which the accused is found guilty of attempting.

**10.** 11 *Del.C.* § 307. *Jury inference of defendant's intention, recklessness, knowledge or belief.*

(a) The defendant's intention, recklessness, knowledge or belief at the time of the offense for which he is charged may be inferred by the jury from the circumstances surrounding the act he is alleged to have done. In making the inference permitted by this section, the jury may consider whether a reasonable man in the defendant's circumstances at the time of the

*Delaware Criminal Code Commentary* 67 (1973); *Miller*, 405 So.2d at 46–47; *Lunz v. State*, 174 Ga.App. 893, 332 S.E.2d 37, 38 (1985) (mere presence at the scene of a crime is insufficient to convict one of being a party to a crime, but presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred). Cf. *Hooks v. State*, Del. Supr., 416 A.2d 189, 201 (1980) (evidence of original plan to rob rental agency three days before robbery of liquor store admissible to establish conspiracy to commit robbery).

We now address the evidence presented regarding Skinner's involvement in the attempted robbery and felony murder of Ronald Irons. Skinner concedes that he was in the area of the Irons residence at the time of the shooting. He contends, however, that he was alone in the driver's seat of a small white car after the shooting occurred and was not aware of any robbery attempt of Ronald Irons. Therefore, since there was not sufficient evidence to establish that an attempted robbery had taken place, or that he was connected to one in any way, there can be no charge of felony murder. The State argues that although Skinner was not present at the Irons residence when the shooting occurred, he was the "getaway" driver for the robbery that had been planned. Therefore, he was an accomplice to the crime and his convictions should be sustained. We agree with the State and find no abuse of discretion in denying Skinner's motion for acquittal as to these charges.

As we noted above with regard to Brooks and Sanders, we find that the testimony regarding the Irons incident, coupled with evidence of Skinner's involvement in the Grinage and Yates robberies and his presence in the area during the period of time when the shooting occurred, could lead a jury to infer that he was involved in the attempted robbery. Since Skinner was not present at the Irons residence, his conviction turns on the statutory provisions of accomplice liability and conspiracy. See 11 *Del.C.* § 271(2)(b); 11 *Del.C.* § 512(1).[11] We rule that the jury could infer both Skinner's intent and the existence of an agreement from the evidence presented to the jury, including Skinner's conduct earlier that day and his consistent association with the other defendants. See 11 *Del.C.* § 307; *Commentary* at 67; *Miller v. State*, Ala.Crim.App., 405 So.2d 41, 46–47 (1981); *Lunz v. State*, 174 Ga.App. 893, 332 S.E.2d 37, 38 (1985); *State v. Ortega*, 209 Mont. 285, 679 P.2d 793, 796 (1984). Cf. *Hooks v. State*, Del.Supr., 416 A.2d 189, 201 (1980).

We believe that the evidence here was sufficient for the jury to conclude that an attempted robbery had occurred. "It has long been our law that the jury is the sole judge of the credibility of the witnesses and responsible for resolving conflicts in the testimony." *Tyre v. State*, Del.Supr., 412 A.2d 326, 330 (1980). See also *Sheeran v. State*, Del.Supr., 526 A.2d 886, 892 (1987). There was no abuse of discretion in denying defendants' motions for judgment of acquittal.

## VII.

Finally, Brooks, Sanders, and Skinner contend that the trial court erred by denying their motions for a mistrial which were based on the State's use of evidence not disclosed in response to discovery demands. Before trial, co-defendants Skinner, Brooks, and Sanders each made discovery demands for the substance of any oral statements made by each defendant. The State supplied each defendant with various police reports, including one which contained Detective Johnson's summary of

---

offense would have had or lacked the requisite intention, recklessness, knowledge or belief.

(b) When the defendant's intention, recklessness, knowledge or belief is an element of an offense, it is sufficient to establish a prima facie case for the State to prove circumstances surrounding the act which the defendant is alleged to have done from which a reasonable juror might infer that the defendant's intention, recklessness, knowledge or belief was of the sort required for commission of the offense.

11. For the text of these provisions, see footnotes 7 and 8.

oral statements made by defendant Skinner to him. Skinner called Johnson as the first witness for the defense. The direct examination touched upon the fact that Skinner had admitted to driving Lum's car while the three separate incidents had occurred, although he claimed he had not participated in any of the crimes. During his testimony, Johnson referred to notes he had taken of his conversation with Skinner.

When the direct examination was completed, the prosecutor examined Detective Johnson's notes for the first time. After referring to the notes, he asked Detective Johnson whether Skinner had told him that he had previously been at the Irons home. Johnson replied, "If I remember correctly, he said something to the effect that, 'I been there once before, and the old man said he would have something in that weekend.'" This statement was not summarized in the police report which had been given to the defendants. Although Superior Court Criminal Rule 16(f) provides that parties have a continuing duty to disclose new material which has been previously requested,[12] the prosecutor did not do so. After this new information was presented, the defendants immediately moved for a mistrial. The trial judge denied the motion, holding that the violation did not prejudice the defendants. After the trial was over, Skinner moved for a new trial, with the same result. All three defendants appeal, arguing that the State violated its discovery obligations and prejudiced their ability to establish a defense.

Superior Court Criminal Rule 16 is in the same general form as Federal Criminal Rule 16.[13] *State v. Minor*, Del.Supr., 177 A.2d 215 (1962). The pertinent part of Superior Court Criminal Rule 16 states that the defendant may make requests for any relevant:

(1) Written or recorded statements or confessions made by the defendant, or a co-defendant ... or copies thereof, and the substance of any oral statement which the State intends to offer in evidence at the trial, made by the defendant whether before or after arrest in response to interrogation [by any known State agent]....

However, almost three decades ago, it was noted that Federal Rule 16 "makes no specific reference to 'co-defendants'. It is obvious that the Delaware Rule provides for much broader discovery than its Federal counterpart." *Minor*, 177 A.2d at 216. In the present case, the State has acknowledged that it was obligated to disclose to Skinner and to his codefendants the substance of Skinner's oral statement.

While it is evident that the prosecutor had no prior knowledge of the contents of the detective's notes, it is also clear that he should have ascertained what was in the notes. Furthermore, once he did learn the contents of the notes, he apparently decided to introduce Skinner's statement in evi-

---

**12.** Superior Court Criminal Rule 16(f) states:

*(f) Continuing Duty to Disclose; Failure to Comply.* If, subsequent to disposition of a motion filed under this Rule, and prior to or during trial, a party discovers additional material previously requested, or falling within the scope of an order previously entered, which is subject to discovery or inspection under the Rule, he shall promptly notify the other party or his attorney or the Court of the existence of the additional material. If at any time during the course of the proceedings it is brought to the attention of the Court that a party has failed to comply with this Rule or with an order issued pursuant to this Rule, the Court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence material not disclosed, or it may enter such other order as it deems just under the circumstances.

**13.** Federal Criminal Rule 16(a)(1) states:

*Rule 16. Discovery and Inspection.*
(a) DISCLOSURE OF EVIDENCE BY THE GOVERNMENT.
 (1) *Information Subject to Disclosure.*
 (A) *Statement of Defendant.* Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government; the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after the arrest in response to interrogation by any person then known to the defendant to be a government agent....

dence without fulfilling his continuing discovery duties to the defense.

 Superior Court Criminal Rule 16(f) reflects the duty of the State to find out about evidence which it has within its control. *Johnson v. State*, Del.Supr., 550 A.2d 903, 911 n. 6 (1988). Detective Johnson was an agent of the State when he interviewed Edward Skinner. Even if the prosecutor did not actually know that the notes contained the reference to Skinner's statement until Johnson testified, he had the duty to know. He also was required to disclose the contents of the notes to the defense and he was not free to introduce the statement in evidence without such advance disclosure. *Id.* at 909.

 However, in this case we find that the prosecution's failure to disclose Skinner's statement was harmless error as to defendants Brooks and Sanders, even though that failure was a clear violation of Rule 16. We reach this conclusion by applying the three-pronged test of prosecutorial misconduct set out in the case of *Hughes v. State*, Del.Supr., 437 A.2d 559, 571 (1981). That test requires this Court to analyze (1) the centrality of the error to the case, (2) the closeness of the case, and (3) the steps taken by the court to mitigate the results of the error. *Id.*

Applying that test to this case as to defendants Brooks and Sanders, we find that significant evidence, independent of Skinner's statement, was before the jury to support a conclusion that a robbery was to be perpetrated at the Irons residence. As noted in Section VI, there was testimony which indicated that Brooks and Sanders were present at the front door of the Irons residence. Testimony also indicated that gunshots were fired while Brooks and Sanders were at the door of the Irons house. Further, Yates's stolen ring was found by the steps of the house and a large sum of money was found in the residence. The jury heard testimony that both Brooks and Sanders had participated in robberies earlier that day.

Although the State failed to comply with Rule 16, the convictions will be set aside only if the violation prejudices the defen-

dants. Since other sufficient, independent evidence was available to the jury through the testimony of various witnesses, we find that Skinner's statement was not central to the State's case against Brooks and Sanders. It follows that the failure to disclose Skinner's statement did not prejudicially affect either Brooks' or Sanders' substantial rights. Accordingly, the Superior Court's denial of a mistrial was proper as to Brooks and Sanders.

 In applying the *Hughes* analysis to Skinner's case, however, we find that the violation of Superior Court Criminal Rule 16 and the introduction of Skinner's statement into evidence is reversible error. Skinner's statement to Detective Johnson provided both a reason for him to be at the scene of the Irons murder and the information that Skinner knew that Irons would be a likely robbery target. It bore directly on the charge of felony murder and was thus central to the State's case against Skinner. While the defense argues that the statement was the only evidence linking Skinner to Irons's death, there was other circumstantial evidence linking Skinner to the crime, primarily his previous activities with the other three defendants throughout the day. Because there was little other evidence than that, however, the case is indeed a close one.

It appears that Skinner's statement would have been admissible at trial had the statement been properly disclosed pursuant to Superior Court Criminal Rule 16. Further, the State argues that it would have disclosed the statement in its pretrial discovery response had it been aware of this particular portion of Skinner's statement. The State contends that the failure to disclose the statement earlier was not the result of wilful misconduct, but of mere inadvertence on its part. However, it is neither the ultimate admissibility of the evidence nor the motivation of the State which is at issue in this situation. It is the violation of the rules of discovery which resulted in a delayed disclosure of evidence to the defendant which this Court must address. We find that such a delay in disclosure prejudiced Skinner in his defense. This is not a case where Skinner's

statement was simply cumulative or in regard to an immaterial matter. The statement provided a direct link to Skinner's involvement in the attempted robbery and directly created the intent on Skinner's part to perpetrate the robbery.

Finally, while the trial court did address the motion for a mistrial conscientiously, it ultimately took no action to mitigate the fact that the prosecutor used Skinner's statement as evidence without first disclosing its existence to the defense. The trial court questioned the prosecutor extensively until it was satisfied that he had not been aware of the contents of the notes prior to Johnson's testimony. The court granted a recess to allow the defense time to prepare its position on the motion for mistrial. After a lengthy discussion with the defense, the court was not convinced that the defendants had been prejudiced by the admission of the statement in evidence. We do not agree with this ruling as to defendant Skinner for the reasons stated above.

This Court has called on the judges of this State to impose sanctions when this type of error occurs. *Brokenbrough v. State*, Del.Supr., 522 A.2d 851, 864 (1987). As to defendant Skinner, this Court cannot conclude that the violation of Superior Court Criminal Rule 16 amounted to harmless error. The facts of this case compel us to reverse the conviction of Skinner because we are of the opinion that the discovery violation prejudiced his substantial rights. *Johnson v. State*, Del.Supr., 550 A.2d 903, 913 (1988).

\* \* \*

Accordingly, we affirm all of the convictions of Brooks and Sanders, as well as the convictions of Skinner arising out of the Grinage and Yates robberies. We reverse the convictions of Skinner as to attempted robbery, one count of possession of a deadly weapon during the commission of a felony, one count of conspiracy in the second degree, and felony murder arising out of the Irons incident, and we remand those charges to Superior Court for a new trial.